Thomas M. Daniel, Esq.
Perkins Coie LLP
1029 W. Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561
(907) 276-3108 (Facsimile)

Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

JASON BRESSER,

           Plaintiff,

v.

SCHLUMBERGER TECHNOLOGY
CORPORATION, a foreign corporation
organized under the laws of Texas, a/k/a
SCHLUMBERGER LIMITED,

           Defendant.

Case No. A05-0246 CV

## DEFENDANT SCHLUMBERGER'S MOTION FOR SUMMARY JUDGMENT ON REMAINING CLAIMS

## CONTENTS

I.     INTRODUCTION ............................................................................. 1

II.    FACTUAL BACKGROUND ........................................................... 2

    A.    Bresser's History with Schlumberger ............................................. 2

    B.    Bresser and Jeff Culbertson's Relationship ................................... 5

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

C.   Bresser's Discussions with Schlumberger
     Management.................................................................6

D.   The End of Bresser and Schlumberger's
     Relationship ...............................................................8

E.   The Factual Background to Bresser's Defamation
     Claim .......................................................................10

III.  ARGUMENT .....................................................................11

A.   Standard for Summary Judgment Under Federal
     Rule 56. ...................................................................11

B.   The Facts as Alleged by Bresser do not Establish a
     Covenant of Good Faith and Fair Dealing Claim
     that Can Survive Summary Judgment...........................12

     1.   Bresser does not allege a subjective breach
          of the covenant of good faith and fair
          dealing...............................................................12

     2.   Bresser's claim as alleged would not
          constitute a viable claim under the objective
          component of the covenant of good faith
          and fair dealing. ...............................................13

          a.   The facts as alleged by Bresser do
               not establish that a public policy
               was violated by his termination.................15

          b.   The facts as alleged by Bresser do
               not establish the causation prong of
               a *prima facie* case of retaliation
               under the covenant..................................21

C.   Bresser Has Alleged No Evidence In Support of His
     Defamation Claim that would Create an Issue of
     Material Fact. ...........................................................25

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

1.    Bresser has not identified the speaker of the alleged defamatory statement and accordingly, he has not alleged evidence sufficient to support his defamation claim. ....................26

2.    The facts taken in a light most favorable to Bresser do not establish the required elements of a defamation claim. ......................................28

    a.    The alleged statement is not false or defamatory. ..................................................29

    b.    The alleged statement was a privileged communication. ...............................31

    c.    The alleged statement was not defamatory let alone a defamatory *per se* statement and Bresser admits that he has suffered no special damages. ...........................................................35

D.    The Facts Taken In a Light Most Favorable to Bresser Do Not Establish The Existence Of A Legally Enforceable Contract. ......................................37

E.    Bresser Has Not Pled a Legally Viable Violation of Law and Public Policy Claim.......................................40

IV.    CONCLUSION ........................................................................42

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

Defendant Schlumberger Technology Corporation ("Schlumberger") hereby moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment on all of plaintiff Jason Bresser's remaining claims.

## I.  INTRODUCTION

In this case, Bresser, a former independent contractor for Schlumberger, asserts four claims against Schlumberger related to his work as an independent contractor for Schlumberger and the termination of his services. Bresser asserts that: (1) Schlumberger's termination of his services violated the covenant of good faith and fair dealing because he was terminated for raising concerns about tools and corporate waste; (2) Schlumberger defamed him; (3) Schlumberger had a contract with him which obligated Schlumberger to pay him the wages and benefits paid to an employee and Schlumberger breached this contract when Schlumberger paid him as an independent contractor; and (4) Schlumberger violated public policy when it paid him as an independent contractor.

Prior to filing this motion, Schlumberger filed a motion to dismiss Bresser's breach of contract and public policy claims to the extent that those claims allege that he was denied employee benefits and sought damages based upon this theory. With this motion, Schlumberger requests dismissal of the remaining claims for the following reasons:

First, Bresser's covenant of good faith and fair dealing claim fails to state a legally viable claim because Bresser has not alleged or produced any evidence that his termination would violate the covenant. In particular he has not alleged or produced evidence that: (1) he was terminated for engaging in a legally protected activity; and (2) that there is a causal nexus between his alleged protected activity

DEFENDANT SCHLUMBERGER'S MOTION FOR SUMMARY JUDGMENT
ON REMAINING CLAIMS                - 1 -                [33454-0002-000000/12545284_1.DOC]
33454-0002/LEGAL12545284.1

and the termination of his services.

Second, Bresser's defamation claim must fail because he has not proffered any admissible evidence (1) that identifies a speaker and a specific false and defamatory statement and (2) that alleges a defamatory statement that would satisfy the four required elements of defamation. Specifically, he has not produced evidence tending to show publication to a third-party of an un-privileged, false and defamatory statement that was either defamatory *per se* or that resulted in special damages.

Third, Bresser's breach of contract claim should be rejected because he has not articulated facts that would demonstrate that a legally enforceable contract was ever formed or that Schlumberger violated the terms of any legally valid contract.

Fourth, Bresser's public policy claim should be dismissed because Bresser has failed to identify any statute or common law that provided a specific public policy that was violated and he has come forward with no evidence or explanation of how or why Schlumberger's contractual relationship with him would violate a specific public policy.

## II.    FACTUAL BACKGROUND

### A.    Bresser's History with Schlumberger

Jason Bresser began working for Schlumberger as an expediter on January 8, 1996. (Ex. A, Deposition of Jason Bresser, Dep. at 16.) To apply for this position he completed an application. (Ex. A, Bresser Dep. at 18-19.) Once he was hired, he was told about benefits, he was given an employee handbook and he completed benefits paperwork. (*Id.* at 17.) After a few months, Bresser

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

became a mud motor technician for Schlumberger. (*Id.* at 23.) In April 1999, Bresser was laid off due to a reduction in force. (*Id.* at 25.) At this time, Bresser opened his own business—Top of the Ladder Handyman Services. (*Id.* at 26.)

Bresser was rehired by Schlumberger in Spring 2000. Before he began work, he spoke to his supervisor about his rate of pay, he again submitted an employment application, he was given employment policies, he received and completed benefit and other employment paperwork, and he was given an offer letter. (*Id.* at 19-22, 27 & 28.) Bresser resigned from Schlumberger in July 2001. (*Id.* at 31.) After resigning he went back to work for his own business. (*Id.* at 32.)

Bresser stated that in December 2001, he decided that he wanted to go back to Schlumberger. He contacted his former supervisor, Joey LeBlanc, and told LeBlanc that he "was willing to go back to the Slope." (*Id.* at 33.) Bresser states that LeBlanc told him that he was "more than glad to have me work for him again and asked me when I could go to the Slope." (*Id.* at 33) Although LeBlanc had spoken with Bresser about becoming an independent contractor prior to his resignation in 2001, Bresser "assumed" that he would be hired as an employee and would receive benefits similar to those he had received before. (Ex. B, Plaintiff's Responses to Defendant's First Discovery Requests, at 17; Ex. A, Bresser Dep. at 35 and 37.) However, Bresser stated that this time he did not go through any of the pre-hire processes he had previously experienced. He did not complete an application, receive benefits information or an employee handbook, and he was not given an offer letter. (Ex. A, Bresser Dep. at 35, 40.)

Bresser concedes that before he returned to Schlumberger in January 2002, LeBlanc never promised him he would be an employee. (*Id.* at 37-38.)

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

DEFENDANT SCHLUMBERGER'S MOTION FOR SUMMARY JUDGMENT
ON REMAINING CLAIMS          - 3 -          [33454-0002-000000/12545284_1.DOC]
33454-0002/LEGAL12545284.1

Bresser states that LeBlanc told him nothing about the position and made no promises to him about the duration, pay or benefits. (*Id.* at 40, 43.) Bresser began as an independent contractor in January 2002. (Bresser says that after he arrived on the North Slope, LeBlanc offered to hire him as an employee at the rate of pay Bresser had previously earned—approximately $16 per hour.) (*Id.* at 33.) Bresser went on to explain that when he rejected this, LeBlanc informed him that he could only pay him a higher hourly rate if Bresser was a contractor. (*Id.* at p. 34.) Bresser denies that he agreed to work as a contractor, but he admits that he insisted to LeBlanc that he had to receive the contractor pay ($25 per hour) instead of the pay LeBlanc offered Bresser to be an employee (approximately $16 per hour). (*Id.* at 28, 34-35.)

Although Bresser started as an independent contractor for Schlumberger in January 2002, Bresser testified that he did not talk to anyone about wanting to become an employee until over a year later. (*Id.* at 38-39.) When Bresser did speak with Jeff Culbertson, LeBlanc's replacement, he states that, just as with the conversation with LeBlanc, he expressed interest in becoming an employee, but he also made it clear to Culbertson that he was not interested in accepting the wage rate that Culbertson told Bresser he would be paid if Bresser were to become an employee. (*Id.* at 47.) Bresser informed Culbertson he would need to make something equivalent to the pay he made as a contractor. (*Id.*) Bresser does not allege that Culbertson ever promised Bresser he could become an employee at that wage rate.

As an independent contractor, Bresser would invoice Schlumberger and Schlumberger would pay his invoices. (*Id.* at 41-42.) Bresser would invoice

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

Schlumberger for both straight time and overtime and Bresser was paid one and one-half his regular rate of pay for his overtime hours. (*Id.* at 42.) Accordingly, Bresser was paid overtime, even though he was not an employee. Bresser stated that the damages he suffered as a result of being treated as an independent contractor instead of an employee were that he could not participate in Schlumberger's 401(k) plan and he did not have medical or dental insurance. (*Id.* at 47-48.)

**B.     Bresser and Jeff Culbertson's Relationship**

During his time as an independent contractor, Bresser reported to Jeff Culbertson and Brian Olson. (*Id.* 54-55.) Bresser worked the same shift as Culbertson and did not often work with Olson. (*Id.* 64.) Bresser stated until 2004, he had a good relationship with Culbertson. (*Id.* at 63.) Bresser stated that initially he and Culbertson got along well and even socialized outside of work. (*Id.* at 76.) In mid-2004, Bresser alleges that their relationship changed because Culbertson became more "demanding." (*Id.* at 63.) Bresser also felt that Culbertson was being manipulated by Olson and by the supervisor who worked in Anchorage and told Culbertson this. (*Id.* at 67.) In 2004 and 2005, Bresser came to believe that Culbertson was lying about "things" that Bresser did. (*Id.* at 73-74.) Sometime after March 2005, Bresser called Culbertson a liar in the open shop. (Ex. C, Defendant's Responses to Plaintiff's First Discovery Requests, at 6.)

Culbertson too reports having issues with Bresser and states that he communicated his concerns to Bresser. Culbertson repeatedly spoke with Bresser about appropriately tagging everything he worked on because Bresser was not doing this. (Ex. C, Defendant's Responses to Plaintiff's First Discovery Requests,

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

at 5.) In late Spring 2005, Culbertson had to speak with Bresser about completing required documentation because plaintiff had failed to complete a build sheet for a tool that had failed. (*Id.*) In April 2005, Culbertson sent Bresser an email instructing Bresser to spend more time in the motor shop and less time in the office. (Ex. A, Bresser Dep. at 70.) Around the same time period, Culbertson spoke with Bresser about Bresser being insubordinate with him after Bresser had called Culbertson a liar. (Ex. C, Defendant's Responses to Plaintiff's First Discovery Requests, at 6.) In July 2005, Culbertson verbally reprimanded Bresser for spreading the forks of a forklift on a nuclear source box that had recently been repaired. (*Id.*) Bresser admits that he adjusted the forklift on the nuclear source box and that Culbertson spoke with him about the matter. (Ex. A, Bresser Dep. at 61.)

Culbertson reported to his supervisors, Steve Laughlin, the Alaska Drilling & Maintenance Manager, and John Burton, Directional Drilling FSM, the issues he was having with Bresser. (Ex. C, Defendant's Responses to Plaintiff's First Discovery Requests, at p. 14-15.) He complained that Bresser was being hostile and abusive and he reported Bresser's mistreatment of the nuclear source box. (*Id.*)

## C.   Bresser's Discussions with Schlumberger Management

In the Spring of 2005, John Yearwood, an executive with Schlumberger who is based in Houston, along with other Schlumberger management were visiting the North Slope. (Ex. A, Bresser Dep. at 78.) During this visit, Yearwood approached Bresser and casually inquired "what was the reason behind our reliability, why was it so good; was it the tools or the people." (*Id.* at 77.) Bresser

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

claims that he told Yearwood that he "didn't have time to answer that." Bresser alleges that he went on to explain to Yearwood that they had had three motor failures that had been misdiagnosed. (*Id.* at 77.) Bresser maintains that he told Yearwood that motors were being run by Schlumberger's clients outside of the parameters of the motors, and that when those motors failed Schlumberger was assuming the cost of the failure when the clients should have paid for it. (*Id.* at 80.) Later Bresser, of his own accord, contacted John Yearwood to follow up on this conversation. (*Id.* at 79-81.) Bresser tape recorded this conversation without Mr. Yearwood's knowledge. (*Id.* at 83; 101; 103-04.) During this conversation, Bresser says nothing about any motor failures, he merely tells Yearwood that he wanted to "present [him] with a presentation on why our MTBF in the motor shop at D & M [Drilling & Maintenance] is so good." (*Id.* at 84.) He went on to tell Yearwood that Yearwood would need to get him some data and closed by telling Yearwood he was "going to open your guys' eyes to where Schlumberger can save a considerable amount of money . . . all over the world." (*Id.* at 84-86.)

Bresser claims that he was raising concerns with Yearwood that management was not allowing technicians like him to diagnose certain failures. However, he never communicated this to Yearwood. (*Id.* at 89-90.) The tape of the conversation with Yearwood includes no mention of this issue by Bresser or Yearwood. (*Id.*) Rather, the tape records that Bresser told Yearwood that if Yearwood got him certain statistical information, Bresser had some good ideas for improvements Schlumberger could make. (*Id.* at 84-89.)

Yearwood had Eric Larson, the Alaska GeoMarket Manager (the head of Schlumberger's Alaska operations) follow up with Bresser. (*Id.* at 80.) They met

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

in Anchorage on May 13, 2005. (*Id.* at 81-82, 93.) Bresser claims he talked to

Larson about the misdiagnosis of these three failures. (*Id.* at 83.) Larson recalls

the conversation quite differently. Larson says that Bresser did not articulate any

specific concerns. Instead, Bresser repeatedly told him that he should "dig

around" and told Larson that if he dug around and asked questions he would figure

out what was going on. (Ex. A, Bresser Dep. at 83; Ex. D, Affidavit of Eric

Larson, at ¶ 3.) Larson did not inform Burton, Jeff Culbertson or Steve Laughlin

about his conversation with Bresser. (Ex. D, Larson Aff. at ¶ 5.)

**D.    The End of Bresser's and Schlumberger's Relationship**

Bresser alleges that on July 11, 2005, Burton contacted him and asked him

to meet with Burton and Laughlin. (Ex. B, Plaintiff's Responses to Defendant's

Discovery Requests, at 14; Ex. A, Bresser Dep. at 59; 109-111.) Bresser was

unable to meet with them until July 14, 2006. (*Id.*) Steve Laughlin wanted to

have this meeting with Bresser to address the concerns about Bresser that

Culbertson was raising. (Ex. C, Defendant's Responses to Plaintiff's First

Discovery Requests, at 14.) Specifically, Laughlin wanted to discuss with Bresser

his attitude, the forklift issue and a way of improving his working relationship

with Culbertson. (*Id.*) At the time of this conversation, Laughlin, Burton and

Culbertson were not aware that Bresser had spoken to Eric Larson or John

Yearwood. (Ex. E, Affidavit of Steve Laughlin, at ¶¶ 2-3; Ex. F, Affidavit of John

Burton at ¶ 2; Ex. G, Affidavit of Jeff Culbertson, at ¶ 2.)

Bresser claims that at this meeting Laughlin and Burton "interrogated"

him about his conversation with Larson. (Ex. A, Bresser Dep. at 148.) However,

Bresser's own description of the conversation is much more consistent with

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

Laughlin's explanation of the reason for this meeting. Bresser conceded that Laughlin and Burton did not specifically question him about what he said to Larson, rather that they asked him more generally what was going on and then proceeded to explain to him that they were hearing reports that Bresser was difficult to work with. (*Id.* at 59, 109-110.) Bresser reports that Burton spoke about Bresser's attitude and mentioned that Bresser was being belligerent. (*Id.* at 59.) He recalled that they expressed concern to him that he was "having problems with people on the Slope." (*Id.* at 110.) Bresser also concedes that in this meeting Burton and Laughlin talked to him about the damage he had done to a nuclear source box by adjusting a forklift on the box. (*Id.* at 60-61.) Bresser conceded that he has no evidence that Jeff Culbertson, Laughlin or Burton had any knowledge that Bresser had spoken with John Yearwood or Eric Larson about the misdiagnosed failures or anything else. (*Id.* at 98-101 & 111.)

During Bresser's conversation with Laughlin and Burton on July 14, 2005 and in Burton and Laughlin's presence, Bresser made a telephone call and told the person on the other end of the line that he was available to go to work. (*Id.* at 59-60.) It turns out that the person on the telephone was Bresser's father, but Bresser did not tell Burton and Laughlin this. (*Id.* at 59-60 & 122.) Burton and Laughlin assumed that Bresser had accepted another job or contract position and was resigning. (Ex. C, Defendant's Responses to Plaintiff's First Discovery Requests, at 10.) When Bresser contacted Eric Larson later expressing confusion about his status, Steve Laughlin made the decision not to ask Bresser back to work and Laughlin informed Bresser of this decision. (*Id.*; Ex, A, Bresser Dep. at 120.)

At his deposition, Bresser testified that he was terminated for adjusting

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

the forklift on the nuclear source box. (Ex. A, Bresser Dep. at 61.)  While

Bresser's misuse of the forklift played a role in Laughlin's decision, it was not the

sole reason for it.  Laughlin discontinued the use of plaintiff's services because

Bresser refused to discuss with Laughlin the issues raised by Culbertson.  (Ex. C,

Defendant's Responses to Plaintiff's First Discovery Requests, at p. 10.)

Specifically, Bresser refused to discuss with Laughlin and Burton: (i) his failure to

follow the directions of his supervisors; (ii) his recklessness with the forklift and

the nuclear source box; and (iii) his rude and inappropriate treatment of his

supervisors.  (*Id.* at p. 10 &12.)  Laughlin concluded that if Bresser was unwilling

to discuss his attitude and mistreatment of equipment that Schlumberger could not

continue to use his services.

**E.    The Factual Background to Bresser's Defamation Claim**

      Bresser alleges that some unidentified person has told a former co-worker

that he "quit, didn't want to come back to work." (Ex. A, Bresser Dep. at 122.)

Bresser assumes that this alleged statement was made by someone in

Schlumberger's management, but admits that all he has been told is that the

statement came from "town." (*Id.* at 124.)  Bresser was unable to identify any

monetary damage he has suffered because of this statement. (*Id.* at 123.)  He

concedes that this statement has not impacted his ability to find work. (*Id.* at 124.)

Moreover, he was not even able to state whether this statement has affected the

listener's opinion of Bresser. (*Id.* at 123.)  In fact, Bresser did not even know the

comment was made until a month before his deposition and months after this case

was filed. (*Id.* at 123.)  Bresser stated that he knows of no other "untrue"

statements that Schlumberger has made about him to a third party. (*Id.* at 124.)

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

# III.    ARGUMENT

## A.    Standard for Summary Judgment Under Federal Rule 56.

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if the court finds "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion" and of identifying those portions of the record which demonstrate the "absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). The nonmoving party can overcome such a showing only by setting forth specific facts that could support a jury verdict in its favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49, 106 S. Ct. 2505, 2510 (1986). Allegations, speculations, or conclusions, as well as inadmissible evidence, are insufficient to meet this burden. *See Columbia Pictures Indus., Inc. v. Professional Real Estate Investors, Inc.*, 944 F.2d 1525, 1529 (9th Cir. 1991), *cert. granted*, 503 U.S. 958 (U.S. 1992), and *aff'd*, 508 U.S. 49 (U.S. 1993); *Forsberg v. Pacific Northwest Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir. 1998), *amended*, 46 Empl. Prac. Dec. (CCH) ¶ 37,996 (9th Cir. 1988).

A genuine issue of material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510. In the absence of such facts, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323, 106 S. Ct. at 2552. There can be no genuine issue of material fact where the nonmoving

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

party has failed to show the existence of an essential element to that party's case. *Celotex Corp.*, 477 U.S. at 323, 106 S. Ct. at 2552.

A number of the claims asserted in this case include allegations that the plaintiff, Jason Bresser, should have been employed as an employee rather than as an independent contractor. However, even assuming for the purposes of this motion that Bresser can establish that he was an employee for certain statutory purposes – for example under ERISA – Bresser has completely failed to come forward with any evidence that would create a genuine issue of material fact as to the claims he has actually asserted in this case.[1] In sum, regardless of whether Bresser was an employee, Schlumberger is entitled to summary judgment on all of Bresser's remaining claims because Bresser has failed to allege and/or produce evidence that would show the existence of one or more essential elements of each claim.

**B.    The Facts as Alleged by Bresser do not Establish a Covenant of Good Faith and Fair Dealing Claim that Can Survive Summary Judgment.**

Bresser's first claim is a covenant of good faith and fair dealing claim that is analyzed the same way regardless of whether he was a contractor or an employee. All contracts or employment relationships in Alaska, including at-will contracts, include an implied covenant of good faith and fair dealing. *Mitford v. de LaSala*, 666 P.2d 1000 (Alaska 1983).

Bresser's First Amended Complaint does not clearly explain why he

---

[1] This case does not include an ERISA claim or any other statutory claim.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

believes his termination violated the covenant of good faith and fair dealing, but he appears to be alleging a retaliation claim. Bresser's First Amended Complaint claims that he was terminated for bringing concerns about tool design and maintenance and corporate waste to his supervisor's attention. (Ex. H, First Amended Complaint, at ¶ 8.) Wrongful termination/covenant of good faith and fair dealing claims like Bresser's that allege a retaliatory termination are analyzed by the Alaska Supreme Court as violation of public policy claims. *See Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 433 (Alaska 2004); *Reed v. Municipality of Anchorage*, 782 P.2d 1155 (Alaska 1989); *Norcon, Inc. v. Kotowski*, 971 P.2d 158 (Alaska 1999).

In *Kinzel*, the Court recognized that the burden shifting framework that it had adopted in *Veco, Inc. v. Rosebrock*, 970 P.2d 906, 918-19 (Alaska 1999), should be used in covenant of good faith and fair dealing retaliation cases. 93 P.3d at 433. In *Rosebrock*, the court endorsed a three-part "pretext" test set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) and in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 257 (1981).

Under this scheme, as a threshold matter, the plaintiff must first establish a *prima facie* case of retaliation. *See Kinzel*, 93 P.3d at 433; *Era Aviation, Inc. v. Lindfors*, 17 P.3d 40, 45-46 (Alaska 2000); *Veco*, 970 P.2d at 919 (quoting *Miller v. Fairchild Indus.*, 797 F.2d 727, 730-31 (9th Cir. 1986)). To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) there was a causal link between the protected activity and the employer's action. *Kinzel*, 93 P.3d at 433; *Lindfors*, 17 P.3d at 45-46; *Veco*, 970

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

P.2d at 919 (quoting *Miller v. Fairchild Indus.*, 797 F.2d 727, 730-31 (9th Cir. 1986)).[2]

The facts as alleged by Bresser do not establish the first or third prong of the *prima facie* case. First, Bresser has not alleged facts that would tend to show that he was terminated for engaging in protected activity like reporting a safety violation. Second, Bresser has not produced any evidence establishing causation. For the purposes of this motion, Schlumberger does not contest that Bresser has alleged facts sufficient to establish the adverse action requirement.

---

[2] If Bresser were able to make the threshold showing required to establish a *prima facie* case, the burden of production then shifts to the defendant, who must rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory or non-retaliatory reason for its actions. *Kinzel*, 93 P.3d at 433; *Lindfors*, 17 P.3d at 45 ("the burden of production, but not persuasion, shifts to the employer"); *Veco*, 970 P.2d at 919 (quoting *Miller*, 797 F.2d at 731); *McDonnell Douglas*, 411 U.S. at 802-03; *Burdine*, 450 U.S. at 253-54. Once the nondiscriminatory or non-retaliatory reason is articulated by the defendant, the burden then shifts back to the plaintiff to prove that the defendant's articulated reasons are a mere pretext for what was, in fact, a discriminatory or retaliatory action. *Kinzel*, 93 P.3d at 433 *Lindfors*, 17 P.3d at 45; *Veco*, 970 P.2d at 919; *McDonnell Douglas*, 411 U.S. at 802-03; *Burdine*, 450 U.S. at 253-54.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

1.    **The facts as alleged by Bresser do not establish that a public policy was violated by his termination.**

The first prong of this public policy retaliation claim requires a showing that Bresser engaged in protected conduct – i.e., that his conduct was protected by a public policy. *See Kinzel* 93 P.3d at 433. Bresser alleges that he spoke to Eric Larson and John Yearwood about his belief that three motor failures had been inaccurately diagnosed by his supervisors, and because of this Schlumberger instead of Schlumberger's client had paid for the operational down time that resulted from the failure. (Ex. A, Bresser Dep. at 80-87, 89-90.) Bresser has never identified how the conduct he engaged in would be legally protected. This is most likely because it is not protected conduct.

In one of the earliest covenant cases, the Court held that public policy is found in "the common law, statutes and the constitution of this state." *Luedtke v. Nabors Alaska Drilling, Inc.*, 768 P.2d 1123, 1132 (Alaska 1989). The Court went on to quote an Illinois Supreme Court case that had noted that "a survey of cases in other States involving retaliatory discharges shows that a matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed." *Id.* (quoting *Palmateer v. International Harvester*, 85 Ill.2d 124, 421 N.E.2d 876 (1981)). Consistent with this, the Alaska Supreme Court, in later cases, has held that discharging an employee for asserting safety concerns or for filing a worker's compensation claim violates public policy, and therefore states a claim for breach of the implied covenant of good faith and fair dealing. *See Kinzel*, 93 P.3d at 433 (discharge in retaliation for making OSHA and workers' compensation complaints breaches covenant of good faith and fair dealing); *Reed*

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

*v. Municipality of Anchorage*, 782 P.2d 1155 (Alaska 1989) (discharging employee for reporting potentially unsafe working conditions states a common law claim for breach of the covenant of good faith and fair dealing); *Norcon, Inc. v. Kotowski*, 971 P.2d 158 (Alaska 1999) (termination of employee in retaliation for reporting safety violations, *i.e.*, consumption of alcohol on the job, violates implied covenant of good faith and fair dealing). Similarly, in another recent case, the Alaska Supreme Court has recognized a public policy retaliation claim where an employee was terminated because he had previously testified against his employer. *Reust v. Alaska Petroleum Contractors, Inc.*, 127 P.3d 807, 812 (Alaska 2005). In *Reust* the Court explained that "several Alaska statutes demonstrate that the state also has an explicit policy protecting witnesses from retaliation." 127 P.3d at 812.

Thus, to date, the Alaska Supreme Court has only recognized public policy tort claims based upon the retaliation provision of the Worker's Compensation Act, retaliation provision of OSHA, and the numerous statutes protecting persons from retaliation for testifying as a witness in a legal proceeding. *See Reust*, 127 P.3d at 812.

Bresser does not allege that he reported safety concerns nor does he identify any statute that would protect the type of issues he raised about how the motor failures were being diagnosed. Instead, Bresser has simply alleged that he disagreed with Schlumberger management's willingness to accept responsibility for certain motor failures and absorb the costs of these failures rather than forcing

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

its clients to absorb those costs.[3]  This was a business decision that Bresser may have disagreed with, but he has never explained how this disagreement would constitute protected conduct.  The concerns Bresser claims he discussed with Larson and Yearwood are not "a matter [that] strike[s] at the heart of a citizen's social rights, duties, and responsibilities."  *See Luedtke,* 768 P.2d at 1132.  Thus, the raising of this type of suggestion or improvement is just not the type of legally protected activity that could form the basis for a public policy wrongful termination claim.

Moreover, in raising this issue of how the failures were diagnosed with Yearwood and Larson, Bresser was just doing his job.  Bresser testified that Schlumberger had in place two systems that encouraged employees to bring forward ideas and improvements like the one he raised with Larson and Yearwood.  Schlumberger encouraged all employees and contractors to file Risk Identification Reports (RIRs).  (Ex. A, Bresser Dep. at 108-109.)  Bresser stated that these RIRs were mandatory and that they could involve "[a]nything you think will help the company save money or raise a concern or an issue, could be safety related, could be reliability issues, could be best practice."  (*Id.* at 108-109.)  Bresser also testified that Schlumberger had a system called "In-touch" that was a catalogue of best practices.  (*Id.* at 115.)  Bresser claims that in suggesting to Larson and Yearwood that Schlumberger should look closer at the motor failures

---

[3] Schlumberger believes that the evidence actually shows that Bresser did nothing more than inform Yearwood and Larson that he had some good ideas and tell Larson to look into things, but Schlumberger understands that on summary judgment the court must view the facts in the light most favorable to Bresser.

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

and who should pay for those failures, he was doing what he had been hired to do. He stated that he spoke with Larson and Yearwood about this issue because it was "what I get paid to do, is to help the company out." (*Id.* at 113.)

Both in the discrimination context and in other types of retaliation cases, courts have routinely held that communications and investigations that employees make as a regular part of carrying out their day-to-day job duties cannot amount to protected activity. *See, e.g., In Huffman v. Office of Personnel Mgmt.*, 263 F.3d 1341 (Fed. Cir. 2001); *Willis v. Dep't of Agriculture*, 141 F.3d 1139, 1140 (Fed. Cir. 1998).

For example, the United States Supreme Court, in *Garcetti v. Ceballos*, 120 S.Ct. 1951 (2006), held that public employees are not protected by the First Amendment from employer discipline when an employee makes a statement pursuant to his official duties. *Id.* at 1954. Ceballos's retaliation claim, like Bresser's, was based on an action required by his position (writing a memo addressing his evaluation of a search warrant) and was rejected because the allegedly protected activity was done "as part of what he . . . was employed to do." *Id.* at 1954. The Federal Circuit Court of Appeals came to a similar conclusion in *Willis v. Department of Agriculture*. In *Willis*, the plaintiff was a "District Conservationist" whose job it was to review farms for compliance with plans approved by the U.S. Department of Agriculture. *Willis*, 141 F.3d at 1140. After he resigned, Willis alleged that he had engaged in protected activity when he made complaints to his supervisors as to the supervisors' decision to reverse most of Willis's findings on farm compliance. He alleged that his discharge violated the federal Whistleblower Protection Act, Pub. L. No. 101-12 (codified at various

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

sections of 5 U.S.C.) because he believed any report by a government employee "concerning the possible breach of law or regulation by a private party is a protected disclosure." *Id.* at 1144. The Federal Circuit disagreed, holding that Willis had not engaged in protected activities under the Whistleblower Act because: "[p]art of Willis's job duties . . . was to review the conservation compliance of farms within his area. In reporting some of them as being out of compliance, he did no more than carry out his required everyday job responsibilities. This is expected of all government employees pursuant to the fiduciary obligation which every employee owes to his employer." *Id.* The Court went on to hold that Willis could not show that he made a "protected disclosure" simply by showing he complained to supervisors about conduct he believed was unlawful. *Id.* at 1143; *see also Huffman v. Office of Personnel Mgmt.*, 263 F.3d 1341, 1352 (Fed. Cir. 2001) (holding that reports made as part of an employee's assigned normal job responsibilities are not protected activity when made through normal channels.)[4]

-------------------

[4] *See also, E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 554 (8th Cir. 1998) (holding that Title VII opposition cases require an employee to "step outside" his employment role); *McKenzie v. Renberg's, Inc.*, 94 F.3d 1478, 1487 (10th Cir. 1996) (holding that human resources director could not maintain a retaliation claim based upon the reporting of certain wage and hour issues because she merely took actions that were required in connection with her duties as personnel director); *Smith v. Language Analysis Sys.*, 41 Va. Cir. 375, 378 (Va. Cir. Ct. 1997) (noting that a director of human resources did nothing outside of her job responsibilities when reporting possible FLSA violations to the company's general counsel and CEO, leaving her actions unprotected); *Bottge v. Suburban Propane*, 77 F. Supp.2d 310, 313 (N.D.N.Y. 1999) ("Protected activity involves some form of objection, however informal.").

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

In sum, Bresser has not alleged facts that would tend to show he engaged in protected activity because (1) the types of conduct he alleges he engaged in are not protected by any law or statute; and (2) the conduct was simply part of his job. Thus, Bresser has not produced evidence that would establish a *prima facie* case of retaliation and his wrongful termination claim must be dismissed.

> **2.    The facts as alleged by Bresser do not establish the causation prong of a prima facie case of retaliation under the covenant.**

Even if Bresser had effectively alleged that he had engaged in protected conduct, Bresser cannot establish the third prong of a *prima facie* case of his retaliation/wrongful termination claim because he cannot show a causal nexus between his alleged protected activity and the adverse employment action taken. An employee seeking to establish a public policy retaliation claim must show "that there was a causal connection between the (adverse employment action and the protected activity)." *Kinzel*, 93 P.3d at 433 (quoting *Miller v. Fairchild Indus.*, 797 F.2d 727, 730-31 (9th Cir. 1986)).

"In order to satisfy the 'causal link' prong of a prima facie retaliation case, a plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action." *Raney v. Vinson Guard Serv., Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997); *see also, Clark County School Dist. v. Breeden*, 532 U.S. 268, 272, 121 S.Ct. 1508, 1510-11 (2001) (employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated though not yet definitively

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108

determined, is no evidence whatever of causality).[5]  The court in *Maarouf v. Walker Manufacturing Co.*, 210 F.3d 750, 755 (7th Cir. 2000), explained the "critical" issue in a retaliation case is whether the person who made the decision to terminate plaintiff's employment was aware of the protected activity because absent such knowledge, the plaintiff cannot establish a causal link between the challenged termination and the protected activity.  Accordingly, courts routinely dismiss retaliation claims on summary judgment where the plaintiff fails to come forward with admissible evidence that the decision-maker had knowledge of the protected activity.  *See, e.g., Breeden*, 532 U.S. at 271-272 (affirming summary judgment where person making a preliminary decision to transfer the plaintiff did not learn until one day after the preliminary decision was made that plaintiff had filed a sexual harassment lawsuit); *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998) (dismissing retaliation claim because plaintiff did not show that the supervisor making the decision to demote her was aware of her EEOC complaint); *Maarouf*, 210 F.3d at 755 (affirming dismissal of plaintiff's retaliation claim because he could not produce evidence that would support an

---

[5] *See also, Holbrook v. Reno*, 196 F.3d 255, 263 (D.C. Cir. 1999) (plaintiff must show that the defendant "had knowledge of [her] protected activity, and that the adverse personnel action took place shortly after that activity"); *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) ("Since, by definition, an employer cannot take action because of a factor of which it is unaware, the employer's knowledge that the plaintiff engaged in a protected activity is absolutely necessary to establish the third element of a prima facie case."); *Goldsmith v. City of Atomore*, 996 F.2d 1155, 1163 (11th Cir. 1993) (same).

PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, Alaska 99501
(907) 279-8561 / Facsimile (907) 276-3108