Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF ALASKA
 3
 4   JASON BRESSER,
 5              Plaintiff,
 6        vs.
 7   SCHLUMBERGER TECHNOLOGY CORPORATION,
     et al.,
 8
                Defendants.
 9   _____
10   Case No. A05-0246 Civil
11
12
13
14
                   DEPOSITION OF JASON BRESSER
15
                     Taken August 7, 2006
16                   Commencing at 9:30 a.m.
17            Volume I - Pages 1 - 165, inclusive
18
19
                      Taken by the Defendant
20                              at
                            PERKINS COIE
21                 1029 W. Third Av., Suite 300
                      Anchorage, AK   99501
22
23
24   Reported by: Susan J. Warnick, RPR
25
```

COPY

Exhibit A
Page 1 of 31

Page 14

1  A   Tammy Hawking.
2  Q   And were you disciplined at all in that position?
3  A   Nope.
4  Q   And did you -- why did that position end? Why did
5  you leave that job?
6  A   I went to Schlumberger.
7  Q   Was that the employer immediately, then, before
8  Schlumberger?
9  A   Yeah.
10 Q   Did you work for anyone else that we haven't talked
11 about?
12 A   No.
13 Q   I'm sorry. Do you remember what your pay was there?
14 A   I don't remember. I worked with R&R Scaffolding.
15 No. Excuse me. Not R&R. Advanced Scaffolding.
16 Q   When was that?
17 A   That was -- must have been the '94, '95, somewhere in
18 there. Probably '95.
19 Q   And how long were you there?
20 A   Probably four months, something like that.
21 Q   And do you remember what your pay was there?
22 A   It was either 27 or 28 bucks an hour.
23 Q   And why did that position end?
24 A   He sold the business to somebody else.
25 Q   And in all of these different positions we talked

Page 15

1  about, did you receive any training? Did the employers
2  pay for you to go to any seminars or outside training, get
3  any certifications or anything?
4  A   I don't believe so.
5  Q   Were there any periods in there between graduating
6  from high school and going to work for Schlumberger that
7  you were not employed?
8  A   For how long?
9  Q   Well, over a couple of weeks.
10 A   I don't believe so.
11 Q   Did you -- were you self-employed at all during that
12 time period?
13 A   No.
14 Q   Hold any business licenses or anything like that?
15 A   No.
16 Q   Did you collect unemployment at all during that time
17 period?
18 A   Which time period?
19 Q   Between graduating from high school and going to work
20 for Schlumberger the first time?
21 A   I believe I did.
22 Q   Do you remember when that would have been?
23 A   It was in '93 or '94.
24 Q   So which jobs are you between there?
25 A   I think it was Osborne. After Osborne.

Page 16

1  Q   And before going to work for Automotive Services?
2  A   It would have been B&C, I believe.
3  Q   I'm sorry. B&C. Okay.
4      Do you remember how long you were out of work
5  that you collected unemployment?
6  A   It wasn't very long. Maybe three weeks.
7  Q   So when did you first apply to Schlumberger?
8  A   It was in December of '95.
9  Q   What position did you apply for?
10 A   Actually, I applied for -- she told me it was going
11 to be shop helper or something like that, and it ended up
12 being an expediter a little while.
13 Q   What's an expediter?
14 A   Somebody who runs around and gets parts, takes parts
15 and pieces over to the machine shop.
16 Q   An who were you hired by?
17 A   I was hired by Larry Banning.
18 Q   And do you remember when you actually started that
19 position?
20 A   Yeah. It was January 8, 1996.
21 Q   What were you told about the job when you were hired?
22 Did anyone describe what you would be doing?
23 A   I was told that you start at the bottom, you work
24 your way up. As somebody new came in, they went to the
25 bottom and you went up, but.

Page 17

1  Q   Did somebody sit down and talked to you about
2  benefits and company policies and stuff like that?
3  A   A little bit. They give you a benefit package. You
4  know, a paper, you had to go home and look at it.
5  Q   Did they give you, like, an employee handbook or
6  something like that?
7  A   Yeah.
8  Q   Did you get any type of training in that position?
9  A   No, it was pretty much hands on.
10 Q   Where was that located?
11 A   In Anchorage.
12 Q   And were you in Anchorage the whole time you were in
13 that position?
14 A   Yeah.
15 Q   And how long were you in that position?
16 A   I don't know. It was a couple of months maybe. It
17 wasn't very long.
18 Q   And that was the expediter position?
19 A   Yeah. Maybe at the most four months, I think.
20 Q   All right. So when you got that position, you had to
21 complete an application; is that correct?
22 A   Yes.
23 Q   I think you said you were given -- let's get this
24 marked.
25      (Exhibit 1 marked.)

Case No. A05-0246 CI                                                                    Jason Bresser

Page 18

BY MS. HALL:
Q  You said you were given a bunch of documents. I wanted to see if those were the various policies that you had to sign -- this is Exhibit 1 -- when you were hired in '96. You can turn to the second page. You can see there is a signature there.
   Is that your signature on the bottom of page two, which is numbered STC 0194?
A  Looks like it.
Q  And then on that next page, STC 0195, is that your signature?
A  Yup.
Q  And then that next page, STC 0196, is that your signature?
A  Yup.
Q  And then the next page, 197?
A  Yup.
Q  And then the next page, 0198?
A  Yup.
Q  So when you were hired in '96, did you have to fill out these forms? Do you remember completing these?
A  Yes.
Q  And then you also completed an employment application, I think you indicated.
   (Exhibit 2 marked.)

Page 19

BY MS. HALL:
Q  If you can look at Exhibit 2 and let me know if this is the employment application.
A  This is not the original one.
Q  So when was this one submitted? And, actually, if you look back, these came from the documents I got from your attorney, and they are sort of out of order. I tried to include everything that might have been the application, but if you look about halfway through, there is a signature page, which is 4/02/2000. Is this the application you submitted the second time you applied?
A  Yes, I believe so.
Q  So that is your signature at the bottom?
A  Which page?
Q  It's number BRES 0045.
   It's sort of confusing because the documents were mixed together when I got them, but I didn't want to take them out of order.
A  What was the question again?
Q  Is that your signature on that document, on 0045?
A  Yes.
Q  You think this is the application you submitted the second time you applied?
A  Yeah, it says 4/2/2000.
Q  So can I ask you a question about that.

Page 20

A  Sure.
Q  You applied in December of '95, and you submitted an application, and when you were hired, you filled out the packet we went through, correct?
A  This one (indicating)?
Q  Exhibit 1, right.
A  Yes.
Q  When you were hired the second time, did you go through the same process?
A  I don't know.
Q  Did you fill out an application?
A  I filled out this application (indicating).
Q  If you look in the middle of this packet, and, again, I'm sorry, these are out of order. These are how they came to me, but if you look at the bottom of the page, there is BRES 0039, and there is again a form that is filled out that is an urinalysis consent agreement.
A  Uh-huh.
Q  It looks like you signed that, then, the second time you were hired?
A  Right.
Q  Then, if you go two more pages, it looks like page BRES 0041 and 0042 are again that packet of patent and confidential information agreement with your signature?
A  It's missing -- oh, it's backwards. Okay.

Page 21

Q  And, again, there is a signature there?
A  Okay.
Q  And that one is not dated, but --
A  Right.
Q  -- because of where it was included in the documents, I was assuming you signed it when you were employed in 2000. Do you remember signing that agreement in 2000?
A  I don't remember, but it's got my signature on it, so I must have.
Q  Then if you flip the next couple of pages, there is another electronic communication policy statement. Is that your signature on that one?
A  I believe so.
Q  So it does look like when you were hired again in 2000, you went through and filled out a whole packet of information. If you keep going in that packet, there is a seat belt policy. Is that your signature on that? Keep going. And then a sexual harassment acknowledgement.
A  Yup.
Q  And those are your signatures?
A  Yes.
Q  And then a business and employee policy statement?
A  Yes.
Q  And so did you -- the second time you were employed, it looks like you also filled out a series of policies and

6 (Pages 18 to 21)

Midnight Sun Court Reporters (907) 258-7100

Exhibit ___A___
Page _3_ of _31_

Page 22

1  had to sign off on a series of policies?
2  A  Yup.
3  Q  When you were hired as an independent contractor, I
4  haven't found any documents like these you were required
5  to sign. Do you remember if you --
6  A  I didn't sign anything.
7  Q  So you didn't fill out any forms like this?
8  A  Nope.
9  Q  Did they give you any handbooks or anything?
10 A  Nope.
11 Q  When you applied the second time, it looks like you
12 also filled out an application, because we identified this
13 application that is Exhibit 2 as being from the second
14 period of employment. Did you fill out an application
15 when you were hired as an independent contractor?
16 A  No.
17 Q  It looks like you were drug tested both times you
18 were hired; is that correct?
19 A  Yes.
20 Q  Were you drug tested when you were hired as an
21 independent contractor?
22 A  Yes.
23 Q  Any type of a criminal background check, do you
24 recall, in any of the time periods of employment?
25 A  I believe they do it when you initially sign up. I

Page 23

1  know they have done one.
2  Q  Would it have been when you were first hired the
3  first period? I haven't found anything.
4  A  I think so. I know we had to sign a piece of paper
5  saying that it was all right for them to do it.
6  Q  Did you sign something like that when you were hired
7  as an independent contractor?
8  A  No.
9  Q  When you were first hired in January of '96, you said
10 you were hired as an expediter. Did you at some point
11 move into the shop helper position?
12 A  Oh, yeah.
13 Q  And you said after a couple of months --
14 A  Mud motor technician.
15 Q  So you moved from expediter to mud motor tech?
16 A  Yes.
17 Q  Was that still in Anchorage?
18 A  Yes.
19 Q  Did you get any evaluations when you were in that
20 position?
21 A  I believe I did. I think there is an evaluation
22 somewhere.
23 Q  That would have been from Larry Banning?
24 A  Right.
25 Q  When you were in that position, how was work assigned

Page 24

1  to you? How did you know what you were supposed to do on
2  any given day?
3  A  We were given motor orders and talked to the rig, so
4  every morning there could be -- basically a to-do list
5  that is an order form that the field would send in saying
6  what they needed and by what date.
7  Q  And did those all come from one person or did you
8  have competing ones you had to select from?
9  A  Yeah, there was a bunch of different -- every rig had
10 their own order.
11 Q  How did you decide which ones you would do first?
12 A  Well, you would prioritize the work depending on what
13 they needed and by what date.
14 Q  Did you do that or did you have a supervisor?
15 A  At that time, it was a supervisor.
16 Q  He would come to you and say, Jason --
17 A  Here's your order, we need to do these, so.
18 Q  And then besides prioritizing your work, what else
19 did the supervisor do to kind of dictate -- did they set
20 your hours that you worked?
21 A  Yeah, pretty much. If we needed to work overtime,
22 they would tell us.
23 Q  And any other sort of day-to-day supervision besides
24 prioritizing orders and telling you about overtime?
25 A  That's about it.

Page 25

1  Q  And what did you do to track the hours you worked?
2  Did you clock in or fill out a time sheet?
3  A  I don't remember. I think it was just -- at that
4  particular time, I'm not sure.
5  Q  And at some point, did the shop move from Anchorage
6  to the Slope?
7  A  Yes.
8  Q  And was that during that period of time or later?
9  A  What do you mean?
10 Q  I know that April of '99 you were laid off?
11 A  Right.
12 Q  And was the shop still in Anchorage in April of '99?
13 A  No. It was in Prudhoe. It was in Prudhoe in -- I
14 believe it was '97, late '96. In fact, I think it was
15 November of '96 when we moved it from Anchorage to
16 Prudhoe.
17 Q  When you moved to Prudhoe, was your supervisor there
18 on site also or in Anchorage?
19 A  No, he was on site.
20 Q  So why -- do you know what happened? Am I correct
21 you were laid off in April of '99?
22 A  That's what they said, yeah.
23 Q  What were you told about why your employment was
24 ended?
25 A  Well, I was told that it was a RIF, reduction in

Page 26

1  force, because of the downturn.
2  Q  And then you were rehired about a year later?
3  A  Uh-huh.
4  Q  What did you do for that year between the two?
5  A  I think that's when I went -- I think I started my
6  own business partway through that, I think.
7  Q  What was your business?
8  A  It was Top of the Ladder.
9  Q  I'm sorry?
10 A  Top of the Ladder Handyman Services.
11 Q  And what did you do?
12 A  I did odd jobs, construction-type jobs.
13 Q  And did you have any partners in that business?
14 A  No.
15 Q  Did you have a business license for that?
16 A  Yup.
17 Q  And then, at some point, you were rehired by
18 Schlumberger?
19 A  Yeah.
20 Q  And how did that happen? Did you have a pending
21 application or did you learn about a position?
22 A  No, they called me up and wanted me back.
23 Q  And do you remember who called you?
24 A  Larry Banning.
25 Q  Then he asked you to submit an application?

Page 27

1  A  He asked me if I would come back. I said, I don't
2  know, I would think about it, and then I thought about it
3  a little while, and we discussed rate of pay, and then
4  went back, filled out the application.
5  Q  And how much did you make the first period of
6  employment with Schlumberger from '96 to '99?
7  A  I don't remember. I think it was 9 something a hour.
8  Q  Did you work a lot of overtime?
9  A  Oh, yeah. And that's with -- then they have -- their
10 pay scale is a kind of weird. They have 1.3 coefficient,
11 depending on where you're at.
12 Q  What does that mean?
13 A  That means there is a multiplier for the state of
14 Alaska for your hourly wage, so what happens is they base
15 your benefits off of that base pay.
16 Q  So you actually make or collect an additional 1.3
17 percent?
18 A  Right, plus overtime.
19 Q  And the overtime is calculated using the coefficient
20 1.3. or is it based on the $9 an hour; do you know?
21 A  It's all based on the 1.3 percent, I believe. So
22 then the overtime is 1.5, whatever that works out to be.
23 Q  So Larry Banning calls you about this second period
24 of employment, and you came back to work, and were you in
25 the same position?

Page 28

1  A  I was in the same position as when I was laid off,
2  yes.
3  Q  So that was mud motor --
4  A  It was lead motor tech, yes.
5  Q  That was up on the Slope?
6  A  Yes.
7  Q  What did you get paid in that position?
8  A  I think it was 16 an hour, something like that.
9  Q  And, then, was that multiplied by the coefficient or
10 was the 16 the amount with the coefficient?
11 A  I think it was with. I'm not sure.
12 Q  And you went through -- and I think we went through
13 those various documents in Exhibit 2, but filled out a
14 bunch of documents when you came back to work including
15 personnel policies and stuff like that?
16 A  Yup.
17 Q  When you were in that position that second time, how
18 was -- actually, before we do that.
19     (Exhibit 3 marked.)
20 BY MS. HALL:
21 Q  Is Exhibit 3 the offer letter that you got when you
22 came back to work in April of 2000 when you you were
23 reemployed?
24 A  Yeah, I guess so.
25 Q  And do you remember if you received a letter like

Page 29

1  that when you were hired the first time, sort of an offer
2  letter setting out your pay?
3  A  I don't know.
4  Q  But you definitely do recall receiving this one?
5  A  Yeah, I believe so.
6  Q  And when you were hired the third time as an
7  independent contractor, did you get a letter like this?
8  A  No.
9  Q  When you went back in April of 2000, how was work
10 assigned you then as the mud motor tech?
11 A  It was sent in through the directional hand and I
12 dealt with it.
13 Q  Did the supervisor prioritize the work for you?
14 A  No.
15 Q  And why the change from before?
16 A  Because I was the supervisor then. I was the lead
17 technician.
18 Q  Is that what the leads do?
19 A  Yeah.
20 Q  Did you have other technicians working for you that
21 you delegated work to?
22 A  Yes.
23 Q  Who would that have been?
24 A  That would have been Chris Dickman.
25 Q  Anyone else?

Page 30

1  A   In 2000? There was -- there was a lot of people that
2  came and went.
3  Q   Did you have just one other person with you on a
4  shift or a couple?
5  A   Usually it was -- there, for a while, it was one
6  person. Then, I think in the second time, there was more.
7  There was, like, three or four people.
8  Q   And what kind of schedule did you work? Were you two
9  on/two off or what?
10 A   Which time?
11 Q   In April of this period.
12 A   That was week on/week off, I believe.
13 Q   And before that from '96 to '99?
14 A   That was two and two, I think
15     MR. JOSEPHSON: Once you went to the Slope?
16     THE WITNESS: Yeah.
17 BY MS. HALL:
18 Q   When you were in town, I assume it was normal?
19 A   When it was in town, it was six to seven days a week.
20 Q   When you were hired as an independent contractor,
21 what was your shift?
22 A   Same thing.
23 Q   One and one?
24 A   Yeah.
25 Q   And do you remember if you got any written

Page 31

1  evaluations in that second period of employment?
2  A   I don't know. I don't think so.
3  Q   And who would have been your supervisor at that time?
4  A   There was -- they went through them like water.
5  Duncan Erskin, Gavin Rennik, Keith Mylam. In 2000?
6  Q   Yeah, from 2000 to --
7  A   I think this -- I think it would have been Larry
8  Banning and Robert Becker at that time.
9  Q   I'm sorry. Larry Banning and?
10 A   Larry Banning and Robert Becker.
11 Q   And then when you were up there that second period of
12 employment from 2000/2001, what did you do to track your
13 time? Did you use a time clock; did you fill out time
14 sheets?
15 A   No, we just go to work. We had a set day that we
16 were supposed to be there, and we had a set time when we
17 came home.
18 Q   Did you do --
19 A   There was a time sheet. There was -- they started a
20 time sheet later on, I think, where you wrote, you know,
21 what you did during that 12-hour day.
22 Q   You always worked a 12-hour day?
23 A   A minimum of a 12-hour day.
24 Q   And you resigned in July of 2001; is that correct?
25 A   Yes, I believe so.

Page 32

1  Q   And why did you resign?
2  A   Because they wouldn't get us help. I was tired of
3  carrying the load by myself. I kept asking them for help
4  and they wouldn't. We were doing enough to get by with a
5  certain amount of people. They kept telling me they were
6  going to get us help, but they didn't.
7  Q   So you wanted them to hire more people?
8  A   Yeah.
9  Q   What did you do after you resigned?
10 A   I did my own business.
11 Q   Was it the same Top of the Ladder Handyman?
12 A   Yeah.
13 Q   So had you continued to operate that while you were a
14 Schlumberger employee?
15 A   Yeah.
16 Q   And did you have any employees at that time?
17 A   No.
18 Q   Do you remember what you were making at the time you
19 resigned in 2001?
20 A   No. No.
21 Q   And so how did you end up coming back to work for
22 Schlumberger as an independent contractor?
23 A   Well, when I went and resigned in 2001, whatever it
24 was, they didn't want me to resign. They tried to get me
25 to stay. They said they would fly me up for a weekend,

Page 33

1  whatever, whatever I could work, and I didn't, and then
2  once I decided that my business, I didn't want to do it
3  anymore, I called Joey LeBlanc up and told him I would be
4  willing to go back to the Slope.
5  Q   And why Joey LeBlanc?
6  A   He was the manager at the time.
7  Q   So you contacted Joey LeBlanc, no one contacted you?
8  A   We had kept in contact throughout that time.
9  Q   Did you know they were looking for somebody?
10 A   Not really. I mean, I had heard that they were
11 having problems and issues in the shop there.
12 Q   And what did Joey tell you about the position?
13 A   He didn't tell me anything about the position. He
14 told me that he'd be more than glad to have me work for
15 him again and asked me when I could go to the Slope. I
16 went to the Slope, and then that's when I asked him about
17 the rate of pay.
18 Q   So you were already on the Slope when you asked about
19 pay?
20 A   Yeah.
21 Q   And what did he tell you?
22 A   He told me that he would pay me the same as what I
23 was making before, and I told him that he had offered me
24 more money than that before I left. Then he told me the
25 only way he could give me more money is if I was a

**Page 34**

1  contractor.
2  Q  So did you agree to be a contractor?
3  A  No, I knew it wasn't the truth, but I was already
4  there. Already quit my job.
5  Q  When you say you quit your job, what did you do to
6  quit your job?
7  A  I quit doing my business.
8  Q  And what did that entail? Did you have to cancel
9  contracts?
10 A  No, I had finished the contracts and let everything
11 lapse.
12 Q  What kind of stuff had you let lapse?
13 A  My business license, insurance, all that.
14 Q  And so the first time you heard anything about being
15 a contractor, you say, is when you were already up on the
16 Slope?
17 A  Yes. That's when he told me I would be a contractor.
18 Q  But before you went back up to the Slope, you hadn't
19 submitted an application, correct?
20 A  No.
21 Q  You hadn't received any type of an offer letter like
22 you did the first two periods or the second period of
23 employment?
24 A  No.
25 Q  Did you have any questions about that before you went

**Page 35**

1  up there about why you weren't --
2  A  I assumed they were going to use this one here
3  (indicating).
4  Q  They hadn't done that the second time, though, when
5  you were rehired?
6  A  Yeah, I guess, yeah.
7  Q  And you're sure that Mr. LeBlanc didn't talk to you
8  before you went up to the Slope about being a contractor?
9  A  He did when I quit this time (indicating).
10 Q  He talked to you about going up as a contractor?
11 A  Yeah.
12 Q  Did you indicate to him you wanted to be a
13 contractor.
14 A  No.
15 Q  So what did you tell him, you wanted the higher rate
16 of pay?
17 A  Yeah, I told him I wanted a higher rate of pay.
18 Q  So what did you make when you were hired as a
19 contractor? What was your rate of pay?
20 A  It was $25 an hour.
21 Q  Plus overtime?
22 A  Yeah.
23 Q  And had you been an employee, what would you have
24 made? What would your hourly rate have been?
25 A  I don't know. They won't tell you.

**Page 36**

1  Q  Who was your alternate when you were an independent
2  contractor?
3  A  Chris Dickman.
4  Q  Do you know what Chris made?
5  A  I have no idea.
6  Q  What did you make when you were in the position when
7  you resigned in 2001?
8  A  I don't know.
9  Q  Was it a lot less than $25 an hour?
10 A  I wouldn't say it was a lot less. It was probably
11 five bucks, six bucks an hour less maybe. No, maybe a
12 little more than that.
13 Q  So you're up on the Slope the first time, it sounds
14 like, for the position. You talked to Joey about the rate
15 of pay, and he tells you the only way he can get you $25
16 an hour is as an independent contractor. Is that --
17 A  He said the only way Schlumberger will pay somebody
18 that much is if you're a contractor, which I knew was
19 wrong because there is other people in the same shop
20 working next to me making at least that much an hour.
21 Q  How did you know that?
22 A  From people talking about it.
23 Q  So did you tell Joey you wanted to be an employee?
24 A  I assumed I was going to be an employee when I went
25 up there, and then we didn't discuss anything after that.

**Page 37**

1  Q  Did you ever talk to Joey or any one while you were
2  there about wanting to be an employee?
3  A  Yes.
4  Q  Who did you talk to?
5  A  Jeff Culbertson.
6  Q  What did you talk about with Jeff?
7  A  He asked me if I would be willing to come back as an
8  employee. I said yes, as long they would give me a fair
9  rate of pay, five weeks of vacation, and my seniority
10 back.
11 Q  And did you tell them what that rate of pay would be?
12 A  No.
13 Q  Did he tell you that you'd make less than the $25 an
14 hour you were making?
15 A  Yeah.
16 Q  He did?
17 A  Well, I don't think he did, but I knew that I would
18 make less.
19 Q  And you told him you were interested in that?
20 A  Yeah. Twice.
21 Q  So in the conversations you had with Joey LeBlanc
22 before coming up to the Slope that first time, did he ever
23 tell you that you were going to be hired back as an
24 employee?
25 A  No, he didn't. I don't believe so.

Case No. A05-0246 CI                                              Jason Bresser

Page 38

1  Q   When you got up there and were told you were a
2  contractor, did you go to anyone else at Schlumberger and
3  say, I was supposed to be or I should be be an employee?
4  Did you go to HR or anybody else?
5  A   No. HR is in Anchorage. No, I didn't.
6  Q   And you're saying at the time, then, you went back as
7  independent contractor, when was that? When did you go
8  back?
9  A   I think it was in January.
10 Q   Of?
11 A   Maybe January of 2002 or 2001.
12 Q   You had resigned in July of 2001.
13 A   So it would have been 2002, I think.
14 Q   And --
15 A   I believe. Yeah.
16 Q   And besides Joey, no one else told you you were
17 coming back as an employee; is that correct?
18 A   I don't believe so, no.
19 Q   And you said you told Jeff Culbertson twice you
20 wanted to be an employee. Were there any witnesses to
21 those conversations?
22 A   I believe one time there was.
23 Q   And who would that have been?
24 A   Corey Haase, and I believe -- I think Guy Sanchez was
25 in the room at that time.

Page 39

1  Q   And when was that; do you remember about the time
2  period?
3  A   That specific time, I believe, was right around --
4  sometime January, maybe. January, February of 2005.
5  Q   Of 2005?
6  A   I think so.
7  Q   Was that the first time he spoke to you about it?
8  A   No, that was the second time.
9  Q   When would he have spoken to you the first time?
10 A   I don't know. It was -- must have been somewhere
11 late 2002, 2003 maybe.
12 Q   And anyone else speak with you about being an
13 employee versus an independent contractor?
14 A   I don't believe so.
15 Q   Do you recall talking to Greg Nutter about that?
16 A   No. I know Greg Nutter asked Jeff to do it, and I
17 talked to Jeff about it. That was the first time.
18 Q   How about John Burton, ever speak to him about it?
19 A   No.
20 Q   Nate Rose?
21 A   No.
22 Q   Steve Laughlin?
23 A   No.
24 Q   Eric Larson?
25 A   No.

Page 40

1  Q   When you went back to the Slope as an independent
2  contractor, did you receive anything in writing at the
3  time you went back, any type of offer, employment
4  contract, anything?
5  A   I don't believe so.
6  Q   And when you came back, did you fill out any of these
7  employment forms that you filled out the other time?
8  A   I don't believe so.
9  Q   Were you given an employee handbook or anything like
10 that?
11 A   No.
12 Q   Before you went back up, had you requested any
13 specific rate of pay?
14 A   No. That's when I was on the Slope when I talked to
15 Joey about it.
16 Q   That was the first conversation you had with anyone
17 about what your pay would be?
18 A   Yup, that was the only conversation.
19 Q   So when you were an independent contractor, what did
20 you do to get paid? Did you send an invoice, fill out a
21 time sheet?
22 A   They told me just make an invoice up off the computer
23 and send it to them.
24 Q   Who told you to do that?
25 A   I think it was Joey. Joey LeBlanc.

Page 41

1       (Exhibit 4 marked.)
2  BY MS. HALL:
3  Q   I just want you to look at Exhibit 4, which are
4  copies of invoices, and tell me if this is what you did to
5  invoice Schlumberger?
6  A   Yup.
7  Q   And if you look at the top of this -- of Exhibit 4,
8  it just has your name and then your home address. Were
9  all the invoices done this way or did you ever have them
10 paid to a company name or any other name?
11 A   I think maybe the first one or two had a company name
12 on it.
13 Q   What company name?
14 A   It was probably Top of the Ladder. I'm not sure.
15 Q   And did anyone at Schlumberger ever ask you for your
16 business license?
17 A   No.
18 Q   Did they ask if you had one?
19 A   No.
20 Q   And, I'm sorry, you were about to say why you think
21 you had it sent to Top of the Ladder.
22 A   Because it was -- I wasn't -- I didn't know I was
23 going to be a contractor, and I had already had it set up
24 in Quickbooks Pro, and that's how I was going to get paid.
25 So I had my wife make up a bill, and then this changed

**Page 42**

1  shortly after that, I believe.
2  Q  And why did it change?
3  A  Because I wasn't doing my business anymore. I didn't
4  want to get screwed up with IRS.
5  Q  And so how did this work? Did you just send in these
6  invoices to accounting or something like that?
7  A  I had to -- my wife had to make the bill. I filled
8  out the time sheet, she faxed it to me, stapled it
9  together, had to have a manager sign off on it, then they
10  send them down to Anchorage, and Anchorage sent them to
11  Houston, and Houston paid. I think it was supposed to be
12  on a 15-day pay period or something like that.
13  Q  And it looks like you would invoice them both for
14  your straight time, which you did, with labor and then
15  overtime; is that correct?
16  A  Yes.
17  Q  And the overtime was one and a half times the
18  straight-time rate?
19  A  Yes.
20  Q  And have you been paid on all the outstanding
21  invoices you had?
22  A  Yeah, all but the one hour I went to the office.
23  Q  I'm sorry. What was that?
24  A  All but the last hour I went to the office when they
25  interrogated me.

**Page 43**

1  Q  So I'm just trying to understand how you ended up
2  back on the Slope. So you called Joey and you told him
3  you would come back, you were interested in coming back?
4  A  Yes.
5  Q  He just told you to show up at the airport at a
6  certain time or did he tell you anything else?
7  A  Yeah, he asked me when I was able to go. I said,
8  well, whenever you need, as soon as possible.
9  Q  How long of a time period was that?
10  A  I believe it was a couple of days later, if that.
11  Q  Did he make any promises about how long you would be
12  employed?
13  A  No, he didn't say anything.
14  Q  Or any other promises about the position?
15  A  No.
16  Q  And so with the invoices, you said you would fill out
17  that time sheet that is attached, and then you said a
18  supervisor would sign off on it. How did that work? I
19  didn't see anything in there with a supervisor's
20  signature.
21  A  That's because that's not the original. Schlumberger
22  has the original that. Every manager had to sign off on
23  it.
24  Q  So this was your copy that you kept?
25  A  Yeah.

**Page 44**

1  Q  So besides that first conversation with Joey LeBlanc
2  where he told you that the only way you could be paid the
3  $25 an hour was to be a contractor, did you have any other
4  conversations with him about being a contractor or being
5  an employee?
6  A  No. The only time was when I resigned there in 2001
7  when they tried getting me to stay.
8  Q  Had he offered you a contractor position to do
9  that --
10  A  Yeah, he offered -- he was trying to offer me
11  anything to stay. I mean, told me he would up my rate of
12  pay, everything, if I wanted to stay an employee.
13  Q  And so with this -- when you came back as an
14  independent contractor, did you believe that you could
15  leave at any time, leave if you found something different?
16  Did you believe you were bound -- obligated to stay for a
17  certain length of time?
18  A  Just like being an employee. I mean, I didn't have
19  any say in anything other than making my own invoice. I
20  was still -- I still had to be at the airport at a certain
21  time every time and had to work that week and, if the
22  relief wasn't there, I had to stay over, fill the gap.
23  Q  What I was asking, though, is you could quit at any
24  time; is that correct?
25  A  I could quit at any time an as employee.

**Page 45**

1  Q  And they could have fired you at any time?
2  A  As an employee?
3  Q  Either one.
4  A  I would imagine, I guess, yeah.
5  Q  So you didn't have a contract that said they would
6  keep you on for two years or one year or anything like
7  that?
8  A  Right.
9  Q  That's correct?
10  A  That's correct.
11  Q  And when you were back up there as an independent
12  contractor, how was the work assigned? How did you know
13  what to do on daily basis?
14  A  Same was it was in 2001.
15  Q  So describe it again for me.
16  A  The directional drillers would send the tool orders
17  in or call me up, tell me what they need and when, that's
18  what I would do, prioritize it and do the work.
19  Q  You did the prioritizing, not your supervisor?
20  A  Right.
21  Q  Did you get any evaluations when you were an
22  independent contractor?
23  A  I don't know. If I did, they weren't known to
24  myself.
25  Q  Did you ever communicate to anyone at Schlumberger

Page 46

1  that you wanted to be a contractor so you would have more
2  flexibility with your scheduling?
3  A   There was no flexibility with it. It was
4  week on/week off, just like being an employee.
5  Q   How about training; were there any training that you
6  were able to skip because you were a contractor whereas
7  employees had to go?
8  A   No.
9  Q   Was there anything employees had to do that you
10 didn't have to do?
11 A   No, nothing.
12 Q   Did they have a time clock or did they fill out time
13 sheets; what did they do?
14 A   Basically, the same thing I just did right here.
15 They filled out what they did, how many hours they worked
16 and the same thing, pretty much.
17 Q   But they would give that to their supervisor, they
18 didn't --
19 A   Supervisors would have to sign it, then it would go
20 to payroll.
21 Q   They didn't do an invoice like you did?
22 A   No.
23 Q   Did you talk to anybody about wanting to continue to
24 pursue your business while you were a contractor for
25 Schlumberger?

Page 47

1  A   No. I didn't have any business when I was a
2  contractor with Schlumberger.
3  Q   When you spoke with both Joey LeBlanc and with Jeff
4  Culbertson, it sounds like you did emphasize that you
5  wanted to make the $25 an hour you were making as a
6  contractor?
7  A   I didn't state the wage. I stated I wanted to make
8  more than 15 bucks an hour or whatever they said I was
9  going to make.
10 Q   More than you would have made as an employee?
11 A   More than -- yeah, they told me that that was all
12 they could give me as an employee, supposedly.
13 Q   And, again, you don't know what your alternate made?
14 A   No.
15 Q   So explain to me, in your words, how you were harmed
16 being an independent contractor instead of being an
17 employee.
18 A   What do you mean, how I was harmed? I wasn't able
19 into put in profit sharing, 401k pension plan.
20 Q   Had you done that before when you were an employee?
21 A   Yeah, I believe so.
22 Q   Had you done an employee contribution to that? Had
23 you had part of your wages deducted?
24 A   Yeah.
25 Q   And what else?

Page 48

1  A   I didn't have medical, dental, none of the benefits.
2  Q   How else were you harmed?
3  A   That's about it. Other than being scrutinized by
4  managers for the kind of money I was making, supposedly.
5  Q   So explain that to me.
6  A   Well, they had to sign off on my time sheets, so they
7  knew what I was getting paid, which as an employee they
8  don't know. The direct supervisors.
9  Q   And there you mean Jeff Culbertson and Brian Olson?
10 A   Yeah.
11 Q   And what do you mean by they scrutinized it?
12 A   Oh, they would say there is no technician worth that
13 much money, no motor technician.
14 Q   So from them, did you get the impression they thought
15 you were the highest paid motor technician?
16 A   Well, they -- probably. I don't know. I mean, I --
17 they looked down on the motor technician because
18 supposedly you don't have to have a degree to do it.
19 Q   Did they tell you that you made more than they did?
20 A   No.
21     (Exhibit 5 marked.)
22 BY MS. HALL:
23 Q   So Exhibit 5 is the amended complaint that you
24 were -- was filed in this case. We're going to refer back
25 to this throughout the deposition. But I wanted to ask

Page 49

1  you, if you turn to page five, I think -- no, sorry --
2  page six, paragraph 20, which starts on page six and goes
3  on to the next page, says that the defendant acted
4  contrary to federal and state statutes and regulations. I
5  wanted your input on which statures you thought were
6  violated, if you had an idea.
7  A   I don't understand what you're talking about.
8  Q   Read paragraph 20. It starts, "In treating
9  plaintiff, for payroll purposes, as a contractor and not
10 as an employee, defendant acted contrary to federal and
11 state statutes and regulations," then it goes on to
12 governing hours, taxes and benefits. I was just wondering
13 if you thought any laws were being violated when you were
14 employed at Schlumberger?
15 A   I don't know exactly what the law is, but what I did,
16 other than creating my own invoices, I was basically an
17 employee. I did the same work that everybody else did,
18 and, therefore, I should have been entitled to benefits.
19 They should have withheld taxes.
20 Q   Did you ever, besides Jeff Culbertson and Joey
21 LeBlanc, the conversations we have already talked about,
22 did you ever go to any anybody at Schlumberger and say
23 that, did you go to anyone and say, I should be an
24 employee?
25 A   No, I didn't. That was Jeff's deal there, where he

Case No. A05-0246 CI                                                                 Jason Bresser

Page 54

1  signed off by people.
2  Q  Did you do that?
3  A  Yes.
4  Q  Did you have a safety passport?
5  A  Yeah.
6  Q  Did you know any other contractors up there, any
7  other independent contractors?
8  A  No.
9  Q  Do you know if any other contractors had to go
10 through that?
11 A  I don't know. I'm sure everybody does.
12 Q  You think everyone goes through that?
13 A  Yes.
14 Q  Before you went back to the Slope the first time as
15 an independent contractor, you didn't question that you
16 hadn't received an offer letter or signed any employment
17 documents?
18 A  No.
19 Q  And was Jeff Culbertson and Brain Olson your
20 supervisors as soon as you came back or were they brought
21 on later?
22 A  Well, it was kind of a -- they were semi supervisors,
23 I believe it was, in 2000. I want to say 2000, somewhere
24 in that area, when I was an employee, and they made some
25 decisions that affected the Alpine contract, and so they

Page 55

1  were basically reprimanded and put down and other managers
2  brought in.
3  Q  Who was that?
4  A  That was Gavin Rennik and Duncan Erskin.
5  Q  And were Gavin Rennik and Duncan Erskin the
6  supervisors, then, when you were hired as an independent
7  contractor, brought back as an independent contractor?
8  A  Well, I think -- I think Brian Olson and Jeff were
9  right at that era, and then shortly after that is when
10 that happened, I believe. I'm not sure.
11 Q  So you think they were --
12 A  That's when I was a contractor, because Larry -- no,
13 when I was an employee, later on, I think that's when Jeff
14 and Brian kind of took over a little bit, and then they
15 made some decisions that lost the Alpine contract, and
16 that was when I was a contractor, I believe. Because Joey
17 at that time was manager, and then Joey actually ended up
18 losing his job over it and had to go back becoming a
19 directional hand in order to stay working.
20 Q  When did Jeff and Brian then move back into the
21 supervisor position?
22 A  It was after Duncan and Gavin Rennik ended up getting
23 transferred out, so it would have been maybe 2004,
24 somewhere in there.
25 Q  And you didn't get any evaluations, you said, when

Page 56

1  you were an independent contractor?
2  A  Not that I know of. I don't know. I think at one
3  point they wanted to do one. I don't know if it ever
4  materialized or not.
5  Q  While you were with Schlumberger, either as an
6  independent contractor or employee, did you go to any type
7  of training, certifications, classes, anything like that?
8  A  I went to all the safety -- all the safety meetings.
9  Everything was mandatory. So I went to whatever they
10 offered.
11 Q  Besides the safety things, was there other types of
12 training on equipment, tools, anything like that, any
13 types of --
14 A  I never went to any of that. Even when I was an
15 employee.
16 Q  And was --
17 A  They told me that I didn't need it. They -- the only
18 class I ever went to with Schlumberger was a defensive
19 driving class, as far as a school goes.
20 Q  And why did you go to that?
21 A  It was mandatory, I guess. I don't know.
22 Q  And when was that? When you were an employee?
23 A  I think so. I think it was when I was an employee in
24 2001.
25 Q  And while you were with Schlumberger, did you pursue

Page 57

1  your education in any way, go to school, go to night
2  school or anything like that?
3  A  As far as for the job?
4  Q  Just in general?
5  A  No.
6  Q  How about for the job?
7  A  I was never -- never let go.
8  Q  What do you mean by that? Was there training you
9  wanted to go to that they didn't let you go to?
10 A  They offer every employee for every position that
11 they have, they have technical schools down in Houston,
12 and I was never sent to any of them.
13 Q  And did you ask to go to any of them?
14 A  Oh, yeah.
15 Q  Who did you ask?
16 A  I asked Larry Banning. I asked Jeff Culbertson. I
17 think Gavin Rennik.
18 Q  And what did they tell you?
19 A  A couple of times when I was an employee, I was told
20 I didn't need them, and when I was an independent
21 contractor, they told me that I wasn't a Schlumberger
22 employee, so they they couldn't send me.
23 Q  So tell me about how your work as an independent
24 contractor ended. Did you resign; were you terminated;
25 what happened?