Case No. A05-0246 CI                                                                         Jason Bresser

Page 58

1  A  Well, that's -- I don't know. It's kind of tricky, I
2  guess. After I completed my hitch in Prudhoe, I was on my
3  days off. John Burton called me at home.
4  Q  When was this?
5  A  I don't know the exact date, but it was -- I think
6  the last day I worked on the Slope was July 7 or 8, and it
7  was after that, the week after that. It was probably, I
8  think, on a Tuesday or something, and he called me up and
9  demanded I come into the office, and I told him I already
10 had prearranged stuff to do and that another day would be
11 fine, I'd be able to make it a different day.
12     What ended up -- he called me the night before I
13 was supposed to go to work, which would have been
14 Thursday, so it was Wednesday night, and told me that I
15 needed to be in the Anchorage office at 10:00 in the
16 morning to talk with them, and I asked what it was about,
17 and he said they were going to terminate me. So then
18 Thursday morning I went into the Anchorage office, and
19 that's when Steve Laughlin and John Burton interrogated
20 me.
21 Q  When you say "interrogated", what do you mean?
22 A  They wanted to know what I went to Eric Larson about.
23 Q  They specifically ask you about it?
24 A  Yes.
25 Q  They said Eric Larson --

Page 59

1  A  Yes. We want to know what you were talking to Eric
2  Larson about, what seems to be the problem, and I told
3  them that it was a confidential conversation, and if they
4  wanted to know, they would have to go ask Mr. Larson. But
5  as far as I was concerned, it was confidential, and he
6  told me he would take care of what we talked about.
7  Q  And they didn't ask you more generally, just what's
8  going on? They specifically asked you what you told Eric
9  Larson?
10 A  They asked me that, and then after that, they made
11 accusations that I was -- that I was being rough to work
12 with, that the whole camp couldn't work with me, that --
13 they made accusations that I was telling people I wouldn't
14 do stuff and all sorts of things, and I asked them, I said
15 at that point, I asked them to call -- there was only one
16 person on the Slope that would say these things, and that
17 was Jeff Culbertson, and I asked them to get him on the
18 phone or to call him in the office so we could all be on
19 the same page, and they wouldn't do it.
20 Q  And during that conversation, do you remember making
21 a phone call?
22 A  Yeah.
23 Q  What was that? What happened?
24 A  I called my dad, so I would have a witness as to what
25 happened.

Page 60

1  Q  What did you say?
2  A  I told him I would go to work for him. That
3  Schlumberger had gave me a letter of suspension, and they
4  told me that it would be indefinite.
5  Q  That's what they said, they said it was indefinite?
6  A  Yeah. I mean, they kept being wishy-washy. They
7  told me it would be indefinite, and then they were going
8  to talk to everybody else and find out what was going on,
9  and they would let me know later. By the end of the
10 conversation, it was indefinite. And I told them I needed
11 to know one way or another so I could make arrangements
12 for work, because I had bills to pay, just like they did.
13 Q  And during that conversation, did they ask you about
14 what was going on with you and Jeff?
15 A  No.
16 Q  Or ask you about -- did they express concerns with
17 your attitude?
18 A  Yeah, John Burton said I was being belligerent and
19 all this and that.
20 Q  Did they ask you about why?
21 A  Well, it was a lie. It was -- I told them I wasn't
22 being belligerent. That's why I wanted him to get in
23 contact with Mr. Culbertson. They wouldn't do it, because
24 they only had one side of the story.
25 Q  But you think Jeff Culbertson had told them that you

Page 61

1  were being belligerent?
2  A  I'm positive.
3  Q  Besides being belligerent, did they say anything?
4  A  They said I was destroying company property and all
5  sorts of things.
6  Q  Did they talk about adjusting the forklift on the
7  nuclear source box?
8  A  They said something to that effect, yeah.
9  Q  Had that happened?
10 A  Yeah, I did adjust the forks on the source box.
11 Q  So what was the deal there? Is that something you
12 were supposed to do?
13 A  Well, I don't know if you're supposed to do it or
14 not. Evidently not. I got fired for it.
15 Q  Did Mr. Culbertson witness you doing that?
16 A  Yes.
17 Q  Did he ask you to stop?
18 A  After I was already out of the loader.
19 Q  Did you laugh at him?
20 A  No, I didn't.
21 Q  Are you sure?
22 A  I'm positive.
23 Q  Were there any witnesses?
24 A  Oh, yes.
25 Q  What was there?

16 (Pages 58 to 61)

Midnight Sun Court Reporters (907) 258-7100

Page 62

1  A  Guy Sanchez was one.
2  Q  Who else?
3  A  John Alevia.
4  Q  And how do you spell the last name, do you know?
5  A  Alevia. I don't know.
6  Q  Anyone else who would have seen that incident?
7  A  I don't know. Maybe Corey, Corey Haase, maybe. I
8  don't know if he actually saw it, but I know the other two
9  actually witnessed it. One of them witnessed the whole
10 thing as far as adjusting the fork. There was no damage
11 done to the box. And the other witnessed Jeff yelling at
12 me, telling me not to do it again, and I did not laugh at
13 him. I told him I was sorry and it would not happen
14 again.
15 Q  And which one saw that aspect of it?
16 A  That was John Alevia.
17 Q  And you said a few minutes ago that you were fired
18 for that. Is that one of the things John said you were
19 being terminated for?
20 A  No, they didn't say what I was terminated for. They
21 just said I couldn't work with my coworkers on the Slope,
22 and because I would not talk to them about what I talked
23 to Eric Larson about.
24 Q  And, again, did they specifically name Eric Larson?
25 A  I believe so, yes.

Page 63

1  Q  And did you have one meeting or two meetings with
2  Steve Laughlin and John Burton?
3  A  As far as termination goes?
4  Q  Or in that time period; in that June or July time
5  period?
6  A  I do remember I was in the office prior to that, and
7  I talked with Steve a little bit. I mean, nothing -- it
8  wasn't a mandatory meeting or nothing like that. I just
9  went in to say hi and all that.
10 Q  What did you talk about?
11 A  He asked me how everything was going as far as work,
12 and I said fine. That was, I mean, prior to this.
13 Q  So what was your relationship with Jeff Culbertson
14 like while you were an independent contractor?
15 A  What do you mean?
16 Q  How did you get along?
17 A  For a while, we got along fine.
18 Q  When did that change?
19 A  I don't know. It wasn't just with me that it
20 changed. It was everybody that he worked with -- worked
21 for him. It was probably mid 2004, something like that.
22 Q  How did it change; in what way?
23 A  It was just -- he was more demanding. He would -- he
24 would accuse people before he had the information at hand,
25 you know, of either doing something wrong or not doing

Page 64

1  something right. Basically, point the finger before he
2  had all the facts. And like I said, it was -- it wasn't
3  just with me. It was with everybody that worked with him,
4  including the people that were on the other hitch.
5  Q  And how about Brian Olson?
6  A  All -- the only time I ever worked with him is when
7  I had to stay over to cover the other technician's hitch.
8  Q  But did you work together okay when you stayed over?
9  A  We didn't really work together. He was in one shop;
10 I was in the other.
11 Q  Is that how it was with Jeff, too? He was in another
12 shop?
13 A  Yeah, he is next door.
14 Q  So he is not standing there supervising you
15 throughout the day?
16 A  Sometimes. I mean, not standing over your shoulder,
17 no, watching your every move, but he was more frequent on
18 that side -- on both sides, because he was on hitch.
19 Q  So describe to me how the shop situation works, just
20 so I understand. Were there a couple of shops, like, in a
21 building?
22 A  There's one bay, and here's another bay, and there is
23 a wall in between. I worked in one bay; he worked in
24 another bay.
25 Q  Are there offices, too?

Page 65

1  A  There is an office in my shop, and then there is a
2  office over here, and then there is offices up inside the
3  camp also.
4  Q  Did Jeff have an office over in the other bay?
5  A  Yes.
6  Q  And your office was in the bay you worked in?
7  A  Yeah.
8  Q  Were there windows or anything between the bays or
9  just a solid wall?
10 A  It's pretty much a solid wall. There is two man
11 doors.
12 Q  Was it just you in your bay or were other people
13 there?
14 A  There was other people there.
15 Q  And who else would have worked there?
16 A  Randy Kockritz, he was an inspector. Sam Shefelbine,
17 Chris Dickman.
18 Q  But Chris was your alternate?
19 A  He was my alternate. Most of the time he was on the
20 other hitch. Sometimes he would stay up or I would stay
21 over and we would work together.
22 Q  Then, in the other bay, what did they do in the other
23 bay?
24 A  That's the electronics portion of the shop. So they
25 do all the electronics on the tools and collars.

Page 66

1  Q  And how many people worked over there?
2  A  There is, I think, three per hitch.
3  Q  So it sounds like in 2004 you feel that your
4  relationship with Jeff Culbertson changed. Did you talk
5  to other employees about that?
6  A  A little bit.
7  Q  Did you talk to Jeff about it?
8  A  Maybe one occasion.
9  Q  Do you remember what you talked about?
10 A  Yeah, he made a comment about our whole hitch that
11 didn't think was right, and I told him I thought he owed
12 the whole hitch an apology, that that wasn't the truth,
13 and he said okay. And, you know, after talking with each
14 other, he said that, yeah, that probably wasn't a very
15 good comment to make, and he did apologize.
16 Q  And when was that?
17 A  It was -- I don't know -- maybe April or May of 2005.
18 Q  And do you remember calling Jeff a liar at some point
19 during that time period?
20 A  No. I don't think I ever called him a liar.
21 Q  How about telling him he was being manipulated by
22 Brian in town?
23 A  Yeah, I think I did that.
24 Q  Do you remember what that was about?
25 A  Not exactly, no.

Page 67

1  Q  Do you remember when you said that to Jeff?
2  A  Do I remember when I said it to him?
3  Q  Yeah.
4  A  The time period?
5  Q  Yeah. Was it over this incident?
6  A  I think so.
7  Q  And was that conversation -- did you have that
8  conversation in somebody's office, alone, or were you in
9  front of a group of people?
10 A  I was in the electronics lab there, and I don't know
11 if -- who all was in there. I know him and I were.
12 Q  But others might have been there?
13 A  Yeah.
14 Q  And do you remember, did Jeff ask you to have the
15 conversation in an office or say, let's talk about this --
16 A  No, not that conversation, no.
17 Q  Was there another one?
18 A  Yeah.
19 Q  Where was that?
20 A  That's was one where he came to me and asked me what
21 was going on, why I went to lunch and all that with Eric
22 Larson.
23 Q  Did he specifically say lunch with Eric Larson?
24 A  No. He wanted to know what was going on, what I did
25 on my time off, on a specific date. So I told him, I

Page 68

1  said, I didn't -- it's confidential, I don't want to be
2  talked to about it. He pursued it.
3  Q  Do you remember what date he said?
4  A  I don't remember. I think it was Friday the 13th.
5  Q  Tell me exactly what you remember Jeff saying.
6  A  He asked me if he could have a word with me. He
7  wanted to talk about some stuff. I said sure. So he
8  asked me to come in. We started talking in the bay
9  outside first. And he started -- I don't remember exactly
10 what he was saying, but it started getting out of hand.
11 He started raising his voice, and I said, hey, I don't
12 want to talk about it. He started yelling, and one of the
13 other guys had actually witnessed that.
14 Q  Who was that?
15 A  That was Ross Brown. He was an intern. And Ross
16 Brown actually walked up to us and was going to ask -- I
17 don't know whether he was going to Jeff something or
18 myself, and Jeff asked him to please leave, that we were
19 going to have a conversation, and he didn't need to hear
20 it.
21     So then he asked me to go -- after Ross left, he
22 asked me into the office, my office. Shut the door and
23 started basically interrogating me about what was going on
24 because he had gotten an e-mail from Eric Larson.
25 Q  He said that; he said, I got an e-mail from Eric

Page 69

1  Larson?
2  A  Yeah, that it was addressed -- that I was supposed to
3  go attend some school or class or something, and he wanted
4  to know what was going on. I told him, hey, I don't want
5  to talk about it, you know. He got pretty mad at that
6  time. He called me -- he told me to go fuck myself and
7  called me a motherfucker, and I walked out of the office
8  at that point.
9  Q  And when was that; do you think?
10 A  I think that was -- I'm not exactly positive. I
11 think it was -- I think it was the hitch right before I
12 got terminated. The hitch up on the Slope, I think.
13 Q  Was that the same hitch as the source box, adjusting
14 the forklift?
15 A  I think so.
16 Q  And had Schlumberger spent money repairing those
17 boxes?
18 A  No.
19 Q  And had it been your practice to adjust the forklift
20 on those boxes or was that the first time?
21 A  That is the first time I had ever did it. Typically
22 what you do, you go over a pipe rack and set the fork
23 lightly on it, just relieve a little bit of pressure, and
24 it articulates, and it sits right on top of it. It
25 doesn't move. I mean, I could do it on a car and not even

Page 70

1  scratch a car.
2  Q  So why that time did you do it on the source box
3  instead of a pipe rack?
4  A  Because one of the hands, Guy Sanchez, was in a
5  hurry. He was the one in charge of the sources. He had
6  to meet a plane that morning because his mother-in-law had
7  just went to a hospital for a heart attack.
8       (Exhibit 6 marked.)
9  BY MS. HALL:
10 Q  Do you remember receiving this e-mail?
11 A  Yup.
12 Q  What was this about?
13 A  This was about, Jeff thought I was spending more time
14 in the office than I should be and, basically, it was a
15 power-trip thing, and he wanted to let town know that
16 supposedly I was spending too much office time in the
17 office, not enough shop time. And so this was, instead of
18 just coming to me and saying, hey, you know, I think that
19 you're spending too much time in the office, not enough
20 outside, that he sent me this e-mail, and I talked to him
21 about it, and we rectified the situation.
22 Q  Did you start spending more time in the shop?
23 A  Yeah.
24 Q  Were you mad at Jeff for sending this e-mail?
25 A  No, not really.

Page 71

1  Q  Did your attitude towards him at all change after
2  this?
3  A  Not really. I mean, I thought it was kind of
4  demeaning, but you have to roll with the punches. If
5  that's the way he wants to present his attitude as a
6  manager, I mean, that is his prerogative, so.
7  Q  So do you have any specific complaints about Jeff's
8  supervision?
9  A  Any specifics? I just don't like the fact that he's
10 lied and manipulated managers in town to believe what they
11 believe now, I mean, and it's just not myself, he does it,
12 you know, to everybody.
13 Q  What do you think -- so what did he do? How did he
14 lie and manipulate?
15 A  Well, for one, he called town and told them that I
16 had built a tool and didn't have any paperwork and this
17 and that. After he had already talked to town -- we
18 couldn't find the paperwork, and after he talked to town,
19 instead of calling town back and saying, hey, I was wrong,
20 you know, we found the paperwork and Jason did build the
21 tool, and there is paperwork on it, he just washed it
22 away, because he didn't want to look stupid, is what he
23 told me.
24 Q  So with that instance, you said he found the
25 paperwork he was looking for?

Page 72

1  A  I found it, yes.
2  Q  What was it? If I wanted to see that paperwork, what
3  would I look for?
4  A  It was a build sheet on a nine and five-eighths mud
5  motor that was a failure.
6  Q  And where did you find it?
7  A  It was -- that particular one was actually on a
8  clipboard. It wasn't where it should have been, hanging
9  in the motor shop, instead of in the file.
10 Q  And why was this significant? I'm obviously not a
11 technician, so tell me what had happened and why?
12 A  Well, if you send a tool out to the client and it
13 fails, there is a cost acquired by Schlumberger. So,
14 usually, typically it's $8,000 an hour for the rig time.
15 So if you're six hours in the hole, there is six hours
16 out, six hours back in minimum, and depending on the
17 failure, they hold the technicians accountable or try to.
18 Q  What do they do to hold the technicians accountable?
19 A  Well, you make sure the paperwork is right, and if
20 not, sometimes they will write a letter, put it in your
21 file, in your personnel file, reprimand you.
22 Q  And were you reprimanded for a failure?
23 A  I don't know, I mean.
24 Q  Have you ever seen anything that indicates that?
25 A  No. I mean, not -- I never got anything in my

Page 73

1  write-ups. In fact, I have never had any pink slips.
2  Q  And so why do you think Jeff Culbertson was blaming
3  you for this or trying to blame you for this? What makes
4  you think that?
5  A  I don't know.
6  Q  What makes you think he was doing that? I mean, did
7  somebody tell you Jeff said you did this or why?
8  A  Well, it's in the documents you guys wrote up.
9  Q  Where?
10 A  I don't know. It was in the -- I think it's one of
11 those documents.
12 Q  What do you think it says?
13 A  It talked about how he went to -- one of the nine and
14 five-eighths failures or something like that. I don't
15 remember exactly. I could probably find it.
16 Q  So what else do you think that he did that was lying
17 or manipulating?
18 A  Oh, people told me that he would lie about stuff that
19 I did.
20 Q  And who told you that?
21 A  Guy Sanchez, for one. You know, he worked in the
22 same office there and heard him on the phone talking to
23 town.
24 Q  Anyone else?
25 A  No.

Case No. A05-0246 CI                                                                    Jason Bresser

### Page 74

1  Q  And when would that have been going on, this supposed
2  lying about you?
3  A  I don't know. Probably 2004, 2005.
4  Q  And any idea why Jeff would have done that?
5  A  Well, there is -- it's speculation. It's what I have
6  heard, and I don't know if it would be factual, but at one
7  point, I was told by Jeff that one of his objectives was
8  to get me hired as an employee, Schlumberger employee, and
9  evidently -- I don't know what the deal was, but if he
10 couldn't meet his objectives, then he doesn't get his
11 promotions. So I think maybe that was it. I don't know.
12 I don't know for sure if that was actually his objective
13 or if he is just lying about it or not, but.
14 Q  To your knowledge, did he do this to anyone else? Do
15 other people feel like they he was lying about them?
16 A  I don't know. Possibly I don't know if it would be
17 factual, so.
18 Q  But no one else complained to you and said, I feel
19 Jeff is lying about me or I think Jeff's -- anything like
20 that?
21 A  I can't say for sure. I mean, I would -- maybe Chris
22 Dickman, maybe Guy Sanchez, but I wouldn't put it in
23 stone.
24 Q  How was your relationship with your coworkers?
25 A  It was fine.

### Page 75

1  Q  Have any problems, any issues, with any of your
2  coworkers?
3  A  No.
4  Q  Did you ever have to make any complaints about any of
5  your coworkers?
6  A  No.
7  Q  Do you know if any of them ever made any complaints
8  about you?
9  A  I don't think so.
10 Q  And who would you have considered -- when I ask that
11 question about coworkers, who are your coworkers? Who did
12 you consider your coworkers?
13 A  Well, it would Jeff Culbertson, Guy Sanchez, Randy
14 Kockritz, Corey Haase, and, I mean, that's probably it. I
15 mean, unless you want coworkers on the other hitch.
16 Q  No. I mean, would you have considered them your
17 coworkers? I'm just interested in who you consider.
18 A  Yeah, I considered all them my coworkers, kind of,
19 but the ones I mainly worked with were those there.
20 Q  Who would have been the other hitch, just so I know?
21 A  There would be Brian Olson, Kit Perkins, Sam
22 Shefelbine, Chris Dickman, and Erik Bishop.
23 Q  And did you socialize outside of work with any of
24 these guys in either group?
25 A  Somewhat, yeah.

### Page 76

1  Q  With Jeff Culbertson?
2  A  Yeah.
3  Q  So what did you do?
4  A  One year we went hunting together. I was invited to
5  his birthday party just right before all this.
6  Q  When was this?
7  A  I don't remember the exact date, but it was in -- I'm
8  going to have to say 2004 maybe. Maybe early 2005. It
9  was either late 2004 or early 2005.
10 Q  So just so I understand, you never had a contract
11 with Schlumberger; is that correct?
12 A  No.
13 Q  Did you have anything that -- when you came back as
14 an independent contractor, anything, any type of written
15 document that set forth your relationship with
16 Schlumberger, your independent contractor relationship?
17 A  I don't believe so, no.
18 Q  Were there any policies that you believe specifically
19 applied to you as an independent contractor? Did you
20 believe the employee handbook applied to you?
21 A  I would imagine. I mean, I don't know. I mean, it
22 depends on who you talk to.
23 Q  So what do you mean by that?
24 A  Well, I mean, if it works to Schlumberger's
25 advantage, yeah, it would apply to me. If it didn't,

### Page 77

1  well, then, no. So, like all my technical schooling and
2  all that, no. If it helped me out, no, it won't, but
3  anything else, they would want me to do.
4  Q  Did you ever talk to anyone about what policies would
5  apply to you?
6  A  No.
7  Q  So in your complaint, which is Exhibit 5, paragraph
8  eight, which is on page two, says that you brought
9  problems of tool design and maintenance and corporate
10 waste to the attention to the defendant's manager.
11    I want you to tell me what happened. Tell me
12 what issue of tool design and maintenance did you bring
13 forward and who did you bring them to.
14 A  I brought those to John Yearwood's attention first.
15 He actually came and asked me.
16 Q  Tell me about that. Describe what happened.
17 A  He asked me if I -- what was the reason behind our
18 reliability, why was it so good; was it the tools or the
19 people, and I told him at that time I didn't have time to
20 answer that, I said, but there are some reasons I had.
21 There is three failures that were blamed on the shop that
22 shouldn't have been, that were misdiagnosed, and I talked
23 about, I think, one or two of them, and then I told him I
24 would get back with him on that. And that's when I --
25 Q  How did that conversation take place?

Page 78

1  A   What do you mean?
2  Q   Was he up visiting?
3  A   Yeah, he was visiting in Alaska, and he was actually
4  in the motor shop at that time.
5  Q   And was anyone else there?
6  A   I believe Eric Larson was there. There was a bunch
7  -- a bunch of bigwigs there. There was John Yearwood,
8  Eric Larson, and then a bunch of other managers.
9  Q   Would Eric Larson have heard the conversation?
10  A   I think he heard part of it. I don't know if he
11  heard the whole thing, but he was standing right next to
12  him at one point.
13  Q   Anything else you talked to him about?
14  A   No.
15  Q   How long was that conversation?
16  A   I don't know, 15, 20 minutes maybe. I told him I
17  would get a hold of him when I had more time, talk to him
18  about it.
19  Q   And, then, did you raise issues with anyone else that
20  are described in that paragraph eight?
21  A   Eric Larson.
22  Q   And tell me about that.
23  A   We -- I had actually called John Yearwood and told
24  him I wanted to meet with him again and go over some of
25  these issues, and he told me that it would better if Kyle

Page 79

1  Holdenfield (ph) was there, and I asked him to keep it
2  confidential, and he says, well, okay, whatever, and after
3  I got off the phone with him -- he told me that he would
4  contact me at a later date. Nothing really materialized
5  over that.
6       I went back to the Slope, and Eric Larson had
7  contacted me while I was up on the Slope and said that
8  John Yearwood had contacted him and wanted him to speak
9  with me and that it was supposed to be confidential, so
10  keep it confident. That I had some concerns about the
11  tools and some of these failures.
12  Q   So Eric Larson calls you on the Slope -- I'm sorry.
13  Take a step back. So in your complaint when you say you
14  raised these issues of tool design and maintenance and
15  corporate waste, what you're referring to is this
16  conversation with John Yearwood and the conversations with
17  Eric Larson?
18  A   Yes.
19  Q   And in the conversation you had in person with John
20  Yearwood, you think -- just so I understand, you
21  identified two failures?
22  A   That was in the direct conversation when I was there
23  on the Slope, yes.
24  Q   And what specifically was your concern there?
25  A   That things were being run out of their parameters or

Page 80

1  it wasn't necessarily being -- the tools weren't being run
2  in their parameters, and, therefore, the shop or
3  Schlumberger was assuming the cost of the failure, which
4  wasn't right.
5  Q   So would the client have been the one running it
6  outside of its parameters?
7  A   Right. They should have acquired the cost of the
8  failure. It shouldn't have been considered a failure, but
9  since it was wrongfully misdiagnosed, we assumed the cost
10  of the failure. In one month, there was -- I think it was
11  one month, there was three failures.
12  Q   Did you communicate to John Yearwood that that was
13  your concern or did you just generally communicate to him
14  you wanted to talk about failures?
15  A   I don't think I actually -- I wanted to talk strictly
16  about that, but I never got the opportunity to talk solely
17  about that with him. He ended up contacting Eric Larson.
18  I spoke to Eric Larson about it.
19  Q   I'm just trying to understand what you told John
20  Yearwood. Did you just tell him, I have general concerns
21  about failures or what did he tell him?
22  A   No. He had asked me a question on the Slope, and I
23  wanted to answer that question, and I wanted to show him
24  why our reliability was so high, and the concerns that I
25  was having at that particular time with three failures,

Page 81

1  because that makes your reliability go down.
2  Q   Did you tell them that? Did you say, there have been
3  three failures?
4  A   Oh, yeah. Yeah, I talked to him about them.
5  Q   Did you talk to him about the three failures
6  specifically?
7  A   No, not him. I talked to him, I think, specifically
8  about one.
9  Q   Then Eric Larson calls you on the Slope?
10  A   Yup.
11  Q   And what happens next? Do you know when that was?
12  A   Not right off the top of my head, but I do know that
13  Chris Dickman had stayed over, so he heard my side of the
14  conversation there. He's a witness to it.
15  Q   And did you set up a time to meet?
16  A   Yeah. He asked me -- he asked me or he told me that
17  John Yearwood called him and said I had some concerns and
18  wanted to meet about some tool problems and reliability
19  and stuff like that, and if he would meet with me and keep
20  it confidential, and I told, I said, I didn't want him to
21  feel like I was going up and over his head, you know, but
22  the reason I didn't go strictly to him is he was new, for
23  one, and some of the people that made some of the
24  decisions frequented the Anchorage office, so I didn't
25  feel comfortable coming in there, because I don't visit

Page 82

1  that office, you know, and so it would raise questions or
2  concerns about why I was there.
3  Q  So did you set up to meet somewhere outside the
4  office?
5  A  Yeah, he wanted to have lunch at noon at Boston's.
6  That was set up for May 13.
7  Q  And so you had lunch with Eric. You did met with
8  him?
9  A  Yeah.
10 Q  And what did you talk about?
11 A  We talked about the three failures, why they
12 shouldn't have been -- why Schlumberger shouldn't have
13 assumed the cost of the failures and why we ended up doing
14 that. I mean, the technicians weren't even involved in
15 diagnosing the failure, which normally we are.
16 Q  So did you specifically identify for him the three
17 failures you were talking about?
18 A  I believe so, yeah.
19 Q  And told him that's what your concern was?
20 A  Yeah.
21 Q  Did you tell him he needed to go dig around, that if
22 he did dug around or if he asked questions he would figure
23 out what was going on? Do you remember making comments
24 like that to him?
25 A  I don't believe so. I mean, I told him that -- I

Page 83

1  told him I thought -- if we were to go back in the files,
2  there was -- there might be more failures that they
3  assumed the cost of, possibly. I might have told him
4  that.
5  Q  Anything else? So you don't remember that he needed
6  to ask questions or dig further, that he would know what
7  your concerns were if he just dug around?
8  A  I don't know.
9  Q  Did you have anything to drink during the lunch?
10 A  Yes, I had one drink.
11 Q  Just one?
12 A  Yeah.
13 Q  So your attorney's produced some tapes to me. I
14 wanted to play some of these so you could identify for me
15 kind of what the context of these conversations were.
16 This first one, I think, is your conversation with John
17 Yearwood on the phone.
18 A  Okay.
19 Q  Did you speak to Mr. Yearwood just twice?
20 A  Once in person, once on the phone.
21 Q  And so if after you listen to this, if you can let me
22 know if this is the telephone conversation.
23    (Beginning of tape conversation)
24    "I met you up in Alaska.
25    Yes. Hi, Jason.

Page 84

1     Hi, how you doing?
2     Good, thanks.
3     I just wanted to say thanks for your visit and
4  being as personable as you are.
5     Thank you for the feedback.
6     And what I wanted to do was I wanted to present
7  you with a presentation on why our MTBF in the motor shop
8  at D&M is so good.
9     Okay. Where are you now?
10    I'm actually up here in Alaska.
11    Okay.
12    I'm actually flying back up to work, but I think
13 that if I can get just maybe a couple of hours of your
14 time to put on a Powerpoint presentation.
15    What would be good -- that would about fine. It
16 would good if Kyle is around.
17    When Kyle --
18    You know Kyle Holdenfield?
19    Okay.
20    Do you know him?
21    No, I did not meet him. He wasn't --
22    He didn't come with the group.
23    Right. Okay.
24    But he is the D&M manager for North and South
25 America, so it would be nice to have him present --

Page 85

1     Yes, it would.
2     So he could see what you'e doing as well.
3     Uh-huh.
4     Can I get back with a -- what's you're schedule?
5  You're up on the Slope --
6     I'm on the Slope today.
7     Yeah.
8     And I will be back next Thursday.
9     To Anchorage?
10    Correct.
11    It's better for you to it do from the Slope or
12 from Anchorage or doesn't make any difference?
13    Well, I would like to do it in person.
14    You mean to come down here?
15    Yes.
16    Okay.
17    I would like to do it in person in front of you
18 guys.
19    All right.
20    And I'm going to need you guys to gather some
21 information that I don't have. So you can see with your
22 own figures what's going on.
23    All right.
24    I know you guys are pretty busy. I don't want
25 to waste your time, so.

Page 86

1   Oh, no. What I need to do is definitely when
2   Kyle comes back, I'll have him coordinate with you the
3   best time. He will have -- shore up of the dates I'm
4   going to be in Houston, then he can see what information
5   you need, and then coordinate an appropriate date.
6       Okay.
7       Because one option is also to do a video
8   conference.
9       Yeah, I don't know. I would prefer just to do
10  it in person.
11      Okay.
12      Because I would like to keep it kinda
13  confidential. My manager doesn't know what's going on.
14      Ahh.
15      And I have spoke to managers in the past --
16      Yeah.
17      And didn't get anywhere.
18      Right.
19      And it's -- for me to come to talk to you, it's
20  a pretty big issue.
21      Yes.
22      And it's going to open your guys' eyes to where
23  Schlumberger can save a considerable amount of money, not
24  just in one location --
25      Right.

Page 87

1       But all over the world.
2       Oh, fantastic. So that's why it's definitely
3   important for Kyle to be present.
4       That's why, yes, it is. That's why I'm pursuing
5   this as hard as I am.
6       All right. So, Jason, what we will do is Kyle
7   is back on Monday. I'll drop him a note.
8       Okay.
9       And I'll have him contact you and we will
10  organize a date.
11      Okay. If he would contact me at home on
12  Thursday --
13      Okay.
14      That would be great.
15      You have your --
16      I don't have CMP up yet.
17      Your home number and all that --
18      No, I don't, but I'm going to go ahead and --
19      Why don't you go ahead and put the home number
20  in.
21      Okay.
22      Why don't you go ahead and put your home number
23  in there?
24      Okay. Nothing is filled out in there.
25      I'm interested in seeing what you've got with

Page 88

1   your name here. You've got your report -- it says you
2   report to Jeff?
3       Yes.
4       And Spine Road, Prudhoe Bay, I guess is where
5   they bay is.
6       I'll go ahead and fill all that out. See, right
7   now, I'm a contract hand. I used to be a Schlumberger
8   employee.
9       Ahh. They changed?
10      Well, yeah, I ended up quitting for different
11  reasons, and I ended up coming back, and I was under
12  contract when I came back, so.
13      All right. So I'll put -- put in your home
14  number there.
15      Okay.
16      So Kyle can call you at home.
17      All right.
18      Okay.
19      Excellent.
20      Thanks very much.
21      I appreciate your time. I know you're a busy
22  man.
23      No, no. No problem. Thanks for calling and
24  thanks for the initiative.
25      No problem. Thank you. Bye-bye.

Page 89

1       Bye."
2       (End of tape conversation.)
3   BY MS. HALL:
4   Q   So that call, all you told Mr. Yearwood is you want
5   to share with him some ideas of why the Alaska MTBF is so
6   good?
7   A   Right.
8   Q   You don't say anything about bad management
9   decisions?
10  A   No.
11  Q   Or failures, correct?
12  A   No.
13  Q   And, in fact, it makes it sound like you think you
14  have information that will help them?
15  A   World wide.
16  Q   World wide?
17  A   That's right.
18  Q   Is that about the gist of the conversation you had
19  with Mr. Yearwood up on the Slope or were you more
20  detailed?
21  A   I was probably a little more detailed. There was --
22  I was definitely more detailed. I had the failures there,
23  and I went over the failures with him, showed him why we
24  were acquiring costs. It was due to, you know, bad
25  management as far as not letting the technicians diagnose

Page 90

1  the problems. They didn't know -- they didn't know how to
2  correctly diagnose the tools because they hadn't worked on
3  them.
4  Q   And at the time you were with Schlumberger, they had
5  one of the better MTBF --
6  A   MTBF.
7  Q   MTBF rating times or whatever --
8  A   Uh-huh.
9  Q   Is that correct?
10 A   Yeah, we had the highest MTBF for the world in
11 Schlumberger, almost three times over.
12     MS. HALL: Can you mark this.
13     (Exhibit 7 marked.)
14 BY MS. HALL:
15 Q   Can you tell me what Exhibit 7 is?
16 A   This was pretty much just an outline of just some
17 stuff that I wrote when all this stuff was going on.
18 Q   So did you -- were these -- if you look at May 5,
19 2005, is that referring to this conversation we just
20 listened to?
21 A   Yes.
22 Q   And were these notes you took during that
23 conversation or after or what were these?
24 A   I think it was after or something.
25 Q   Because it says in here that, let's see, tried

Page 91

1  setting up a time and place to put on Powerpoint
2  presentation to show him and some other people why our
3  MTBF was so good and why our MTBF was going down, because
4  of bad management decisions at the local level, right?
5  A   Right.
6  Q   But you didn't talk about bad management decisions or
7  the MTBF going down in that conversation?
8  A   No, no, I didn't.
9  Q   So these notes aren't actually a recording of what
10 you spoke to Mr. Yearwood about?
11 A   Right. I this -- this part was pretty much just for
12 my own recollection, that the -- because of the bad
13 management was a direct result of the three -- of
14 Schlumberger acquiring the cost of the three failures. It
15 wasn't -- it wasn't that I had talked to John Yearwood
16 about that, no.
17 Q   So these notes don't --
18 A   Those notes --
19 Q   -- don't purport to be notes of what you actually
20 spoke about?
21 A   Right, no. Not exactly.
22 Q   Because, again, you list a whole bunch of people
23 that, I guess, made bad decisions, but you didn't talk to
24 him about any of those people?
25 A   No. Absolutely not.

Page 92

1  Q   You didn't actually specifically ask him to keep this
2  conversation confidential; you said this was kind of
3  confidential?
4  A   I said I wanted to keep it confidential, I believe.
5  Q   We'll let the tape --
6  A   What's that?
7  Q   We'll let the tape stand for itself on that. I heard
8  you say this is kind of confidential, but we don't have to
9  -- we have the tape, so.
10     MR. JOSEPHSON: He said the managers don't know
11 or some words.
12     MS. HALL: Right.
13     MR. JOSEPHSON: I want to keep it confidential.
14     THE WITNESS: Right. Want to keep it
15 confidential.
16 BY MS. HALL:
17 Q   And Mr. Yearwood, listening to this, being on the
18 other end of the conversation, wouldn't know that you were
19 raising issues about bad management or declining MTBF
20 because all you said was that you wanted to talk to him
21 about why the Alaska MTBF was so good?
22 A   Right.
23 Q   So that is correct?
24 A   Yes.
25 Q   So then the next -- this next section on your notes

Page 93

1  there, it says May 6, 2005. What's that? What is this?
2  Are you keeping track of the conversation? What is this?
3  A   It's just a note saying that May -- basically, I was
4  just outlining the dates of what I did and what happened,
5  kind of. That's when Eric Larson -- so it would have been
6  Friday, May 6th.
7  Q   So he calls up the next day to set up the
8  appointment?
9  A   Yeah.
10 Q   All right.
11 A   I asked him to keep it confidential. You know, Chris
12 Dickman was there in the office. He's the one that
13 actually answered the phone.
14 Q   Then, if you look at the next page, it says 5/13,
15 10:15.
16 A   It says what?
17 Q   If you look at the next page, about halfway down,
18 there is an entry 5/13/05.
19 A   Yes.
20 Q   I want to go back. It says May 6, Eric Larson called
21 but then --
22 A   This is -- it's misworded. It's not to set up a
23 lunch date. It was just to verify we were still on for
24 lunch.
25 Q   Oh, the 5/13?

Case No. A05-0246 CI                                                    Jason Bresser

**Page 98**

1   Q   But you don't have any reason to believe that he told
2   John Burton that you were raising concerns or that you had
3   raised any issues?
4   A   I don't know. I mean, I don't know if he did or not
5   for factual. I just know what he told me that, you know,
6   he had talked to Burton. He didn't elaborate on what he
7   said, so.
8   Q   And why is that note under this entry for this call
9   from Jeff?
10  A   What do you mean?
11  Q   Well, I'm just trying to kind of understand what you
12  were doing here with this document, but you recorded a
13  call from Jeff that says Jeff called after Eric and
14  talked, and then you put this other stuff in about John
15  Burton was directly involved in the problem, Burton called
16  Jeff to tell him that Eric had requested some info. I
17  mean, how do you know that John Burton had called Jeff to
18  tell him Eric had requested some info?
19  A   I don't that to be a fact, but that was the time
20  frame of when I talked to Eric Larson, and then Jeff
21  calling was, I mean, within 15, 20, 30 minutes of, you
22  know, of Eric Larson talking to Burton and then Jeff
23  calling my house, which was unusual. I mean, he never
24  really contacted my house.
25  Q   So I thought you said before that you guys had

**Page 99**

1   socialized; he wouldn't call you up and say, let's get
2   together?
3   A   We socialized maybe twice a year. You know, it
4   wasn't like an everyday occurrence when we were in or
5   even .....
6   Q   Were you all planning on possibly going hunting
7   together again this year?
8   A   No, I don't believe so.
9   Q   So there is another conversation, which I wasn't
10  going to play -- it's very long -- where there was a lot
11  of discussion between you and Jeff about bows and I guess
12  his wife passing some sort of a hunting test --
13  A   Yeah.
14  Q   -- and stuff. It sounded like you were making a
15  plan?
16  A   I think he wanted -- he was wanting somebody to go
17  hunting with him up on on the Ugaiushak (ph) River there,
18  so he took -- who was it -- Steve Laughlin, I believe.
19  Q   But this conversation, your concern was that --
20  basically, just that it was so close in time to your call
21  with Eric Larson?
22  A   Correct.
23  Q   But there was nothing in that conversation where Jeff
24  indicated he had heard from Eric or John Burton or anyone?
25  A   No. No.

**Page 100**

1   Q   And so at any point, did Jeff Culbertson tell you
2   that he had -- he knew you had spoken to Eric Larson?
3   A   He hinted around it. I don't think he actually came
4   right out and said, you know, I know that you talked to
5   Eric Larson.
6   Q   So how how did he hint around it?
7   A   Well, Eric Larson had -- he mailed Jeff an e-mail
8   saying that I needed to go to some leadership training,
9   seminar or something that was being held to make sure that
10  I was -- make sure that I was going to be enrolled in
11  that. He knew something was going on because Eric Larson
12  just doesn't tell people, hey, you need to make sure
13  somebody is doing this, or you need to make sure sure you
14  guys are involved in this or nothing like that.
15  Q   And so, did he say that? Did he say, I think
16  something is going on?
17  A   No, he didn't say that. He just, I mean, basically
18  hinted around and asked me what was going on in the
19  conversation with him and I in the motor shop after that.
20  Q   I guess I'm trying to figure out, when you say he
21  asked what was going on, did he ask because he was
22  concerned about your attitude? What was he asking you?
23  What specifically did he ask?
24  A   He just asked me what was going on.
25  Q   So just a general question like that?

**Page 101**

1   A   Yeah, what's going on. What's -- he knew -- he
2   figured that I was up to something, I guess. I don't
3   know.
4   Q   But how do you know that he figured you were up to
5   something?
6   A   Just the way he was grilling me. He wouldn't leave
7   me alone. The guy kept hounding me and hounding me and
8   then he got pissed off when I wouldn't -- when I wouldn't
9   talk to him.
10  Q   But he didn't specifically mention Eric Larson's
11  name?
12  A   I don't believe so.
13  Q   He didn't, I mean, he didn't ask you or specifically
14  mention any concerns or complaints you had raised, he just
15  asked you what's going on?
16  A   Yeah, I think so.
17  Q   So there is another conversation later on where you
18  record a conversation you had with Brian Olson. There is
19  the conversation with John Yearwood we listened to. There
20  is a conversation with Jeff Culbertson. Did you tell any
21  of those people that you were tape recording them when you
22  tape recorded it?
23  A   No, I don't believe so.
24  Q   And then there is a call -- on the same tape as te
25  one from Jeff with John Yearwood, there is a call to

26 (Pages 98 to 101)

Page 102

1  somebody and I didn't get a name. I can just play the
2  beginning part and maybe you can tell me who that is.
3      (Beginning of tape)
4      "-- right on.
5      The hydro 511, yeah."
6      (End of tape)
7      THE WITNESS: That's Larry Banning.
8  BY MS. HALL:
9  Q   That's Larry Banning?
10 A   Uh-huh.
11 Q   And so why had you called him?
12 A   I always call him. I don't know. I was just talking
13 to him.
14 Q   So why did you record him?
15 A   Just see if it was working.
16 Q   Just testing the tape recorder?
17 A   Yeah.
18 Q   So why were you tape recording the calls with
19 messages from Eric Larson -- I'm sorry -- Jeff Culbertson?
20 Why were you doing that?
21 A   What do you mean? They left a message on my tape
22 recorder. At home, he left me a message.
23 Q   Right, but before you prefaced -- you clearly are
24 making --
25 A   I was just making a time line of odd stuff, you know,

Page 103

1  that was going on during this -- after this meeting with
2  Eric Larson.
3  Q   But this is before the meeting with Eric Larson?
4  A   No, that is after.
5  Q   So you made the tape -- I'm sorry. I was
6  misunderstanding. You made the tape of the phone call
7  from Jeff and that introduction with Jeff, you made that
8  after you met with Eric Larson?
9  A   Yeah. That was on my home recording. I just --
10 Q   Went home and did it?
11 A   I went home and said, okay, this is the date and
12 time, here you go.
13 Q   Because the message was left before your lunch with
14 Eric Larson?
15 A   Yes, it was that morning at 10:15, I guess.
16     MS. HALL: Off record.
17     (Lunch recess.)
18     EXAMINATION (Resumed)
19 BY MS. HALL:
20 Q   I wanted to go back to the one of questions I asked
21 you right before we left. The tape recorded conversations
22 that we listened to with John Yearwood and the other tape
23 recorded conversation you provided me, did you tell any of
24 them that you were recording, that you were tape recording
25 them?

Page 104

1  A   No, I don't believe so.
2  Q   And then I can assume you didn't ask any of them if
3  it was okay to tape record the conversation?
4  A   No.
5  Q   Before you went to John Yearwood with your concerns
6  about how these failures were being attributed and that
7  Schlumberger was absorbing the cost, had you talked to
8  Jeff Culbertson about that issue?
9  A   Well, I had tried to, but he couldn't -- he had
10 already told town what he thought, and he wouldn't take
11 the paperwork and say, hey, I messed up, and you know.
12 Q   So tell me what happened. Did you go to him with the
13 paperwork and say --
14 A   Yeah, shortly, I mean, within 10, 15 minutes of him
15 going and talking to town about it, you know, I found the
16 paperwork and said, here, here's the paperwork, and he
17 told me, he says, I can't -- I ain't going to take that,
18 make me look like an idiot.
19 Q   That was with the one failure --
20 A   One failure, yes.
21 Q   -- where the paperwork was missing?
22 A   Yup.
23 Q   You said you felt there were three that you felt were
24 inappropriately being --
25 A   Another one that I addressed was a back-off, and we

Page 105

1  took the blame for that, and then I wasn't even -- wasn't
2  even involved in that one, I mean, but once I got there,
3  it was on my hitch off. Once I got there, you know, I
4  talked to, I think it was, Chris, and said, you know, that
5  is not right. And then I addressed -- I addressed it in
6  front of Jeff Culbertson with one of the guys that was
7  actually out on the rig, and he reassured me that that is
8  exactly what happened, what I -- what I told them had
9  happened, the hand that was out there on the rig
10 reinstated [sic] that that is what happened, and that's
11 why it come apart. It wasn't because nobody torqued it up
12 and sent it out there.
13 Q   And so, did you say to Jeff, I think something is,
14 you know, something had been miscommunicated to somebody?
15 I mean, I'm trying to understand what you -- I mean, did
16 you make it clear to Jeff that you thought there maybe a
17 mistake of some sort?
18 A   Oh, yeah.
19 Q   In what way? What did you tell Jeff?
20 A   He was right there when I was telling him and the
21 directional hand what had happened. I told him, I said,
22 that it didn't go out untorqued, and this is why it came
23 undone, and, I mean, I went over the failure. He
24 diagnosed it as somebody not torquing the connection up
25 before it left the shop.

Page 106

1  Q  How do you know he diagnosed it that way?
2  A  Because he told me. He told town.
3  Q  How do you know he told town? Were you a part of
4  that conversation?
5  A  No. He told me that he talked to town about it.
6  Q  And when you say he talked to town, who would he have
7  talked to?
8  A  I don't -- I would imagine it would have been the
9  managers in town, be John Burton and probably Nate Rose,
10 and Steve Laughlin. I don't know for sure if all three of
11 them were in there or if he just talked to one or not. I
12 don't know.
13 Q  Did you ever -- with any of these concerns, ever go
14 to john Burton or Nate Rose or Steve Laughlin and say, I
15 think Jeff got this a little wrong, or this is what I
16 think about these failures?
17 A  No. I was told not to.
18 Q  By?
19 A  By Jeff.
20 Q  What did he tell you?
21 A  He told me just to keep my mouth shut; he would
22 handle it.
23 Q  When did he tell you that?
24 A  That was -- I don't know -- within the last year,
25 2005.

Page 107

1  Q  And what did that have to do with? You know, what
2  were you talking about?
3  A  What do you mean, what was he talking about? I told
4  him he was wrong in diagnosing the failure the way he did
5  and told him what failure -- the way it should have been
6  diagnosed. He said, just keep your mouth shut, we have
7  already got it under control.
8  Q  And which failure was that?
9  A  One of those was -- I think it was a nine and
10 five-eighths motor.
11 Q  When you were speaking to Eric Larson about your
12 concerns about the failures, you said you had asked him to
13 get some information for you.
14 A  Uh-huh.
15 Q  And it sounded like you were asking him to look into
16 these failures?
17 A  No, no. I was asking him for the reliability of the
18 motor shop for previous years.
19 Q  And I guess I'm curious about how Eric was supposed
20 to get that without, you know, asking for it from the
21 people that would have had it?
22 A  Well, he said he could get it from Houston, I guess.
23 Q  But wouldn't it make sense that he might have asked
24 for it locally from John Burton or Nate Rose or --
25 A  I'm sure he has it. I mean, he has to turn in

Page 108

1  end-of-the-month stuff just like everybody else.
2  Q  So to would make sure, if you were asking Eric to get
3  this information, he would go to the person that would
4  should have it?
5  A  He should have it, yeah.
6  Q  That would be John Burton?
7  A  No. Eric Larson. Eric Larson should have had it or
8  been able to get access to it, I would think, being the
9  Alaska manager.
10 Q  How would he have access to it; do you have any idea?
11 A  I have no idea. He could probably have got it out of
12 the archives from Houston, I imagine.
13 Q  Does Schlumberger have some sort of a -- some kind of
14 a complaint hot line or ethics hot line or something that
15 you can call?
16 A  Not that I know of.
17 Q  How about, what are those RIRs I have seen?
18 A  It's called risk identification report.
19 Q  What is that?
20 A  Anything that you think will help the company save
21 money or raise a concern or an issue, could be safety
22 related, could be reliability issues, could be best
23 practice. Could be, you know, for instance, if you're
24 cooking on a holiday, make sure you shut the oven off,
25 when you pull the turkey out.

Page 109

1  Q  Are you encouraged to do IRIs?
2  A  Oh, yeah. It's mandatory.
3  Q  You have to do a certain number of them?
4  A  A certain number per year.
5  Q  Did you do RIRs with your concerns about these three
6  failures?
7  A  I don't know if I did or not. I don't think I did.
8  I don't remember.
9  Q  And you never made any calls to any hot lines or any
10 internal complaint procedures?
11 A  I don't even know if they have any.
12 Q  So we talked about your conversations with Jeff
13 Culbertson, and that he never specifically mentioned Eric
14 Larson's name. How about when you spoke with Steve
15 Laughlin and with John Burton; did they tell you that they
16 had talked to Eric Larson about your conversations with
17 Eric?
18 A  No. They wanted to know what I was talking about.
19 Q  But did they say we wanted to know what you're
20 talking about to Eric Larson?
21 A  They wanted to know what the meeting was about
22 between Eric Larson and I.
23 Q  They specifically said your meeting with Eric Larson?
24 A  Well, not specifically with Eric Larson. They wanted
25 to know what was going on, what was said.

Page 110

1  Q  And how did you know, though, that they were talking
2  about, I mean, if I just sat down and said, what's going
3  on, you know, you don't know what -- I mean, are you
4  talking in general life. Did they specifically say, we
5  want to know what's going on between you and Eric Larson?
6  You had a meeting with Eric Larson; what did they do that
7  made you think they were asking about your meeting with
8  Eric Larson?
9  A  I don't remember. I can't tell you for sure that
10 they said Eric Larson. They asked me what was going on, I
11 know that for sure. What -- they didn't -- I don't know.
12 Q  Did they indicate that they were wondering what was
13 going on between you and Jeff Culbertson?
14 A  They didn't indicate that. They indicated that I was
15 having problems with people on the Slope, supposedly, and
16 that nobody could work with me and this and that. And
17 reiterated to them that the only person I might have a
18 problem with would be Jeff Culbertson. And that he was
19 trying to corner me and ask me all sorts of questions, and
20 I asked them at that time to make a formal complaint about
21 him calling me the two negative names.
22 Q  Did -- is there any way or do you think that maybe
23 they were asking what was going on, why are you having
24 these issues with these people or even with Jeff, I mean,
25 not -- that they weren't at all referring to your

Page 111

1  conversation with Eric Larson?
2  A  I don't -- I don't think so. I mean, why wouldn't
3  just they come straight out and say, are you having
4  problem with Jeff?
5  Q  Well, they were asking you what was going on?
6  A  Right.
7  Q  Do you think maybe that's what they were asking you?
8  A  I don't think so.
9  Q  So do you have any reason to believe that they knew
10 that you had spoke to Eric Larson? Did anyone ever tell
11 you that Eric Larson told John Burton or Jeff Culbertson
12 or Steve Laughlin that you had spoke to him?
13 A  I can't say for a hundred percent, no.
14 Q  So you can't say -- you have no evidence that they
15 knew you had spoke to him?
16 A  No.
17 Q  During those conversations with Steve and John Burton
18 or the conversation, did they ask you about your attitude
19 at all or talk to you about your attitude?
20 A  Yeah. John Burton suggested that I had an attitude
21 problem, because I wouldn't talk to them about what was
22 going on. I told them it was confidential.
23 Q  So this issue that you raised with John Yearwood, the
24 conversations you had with John Yearwood, and the
25 conversation you had with Eric Larson about the failures,

Page 112

1  do you think that you were making a report that is
2  required by any type of stature, like an environmental
3  statute or some other type of statute?
4  A  That would be required?
5  Q  Yeah.
6  A  I don't know if it would be required, but in their
7  handbook it says, you know, feel free to come forward if
8  you're going to, you know, help the company in any way,
9  shape, or form, pretty much.
10 Q  And I was going to ask you about that. So in
11 paragraph nine of your complaint, you quote this language,
12 you say, that -- I guess it's actually on page three. You
13 say, "Giving all people absolute authority to stop any
14 activity," this part; is that from a handbook or what's
15 that from?
16 A  That is from a book that the CEO sent out.
17 Q  What was the book; do you remember what it was
18 called?
19 A  I don't remember, but that was a quote from the CEO
20 himself.
21 Q  Do you have that document?
22 A  Yeah, I got a book.
23 Q  So outside of raising the issue, having the
24 conversation with Eric Larson and calling John Yearwood,
25 did you raise your concerns about how these failures were

Page 113

1  being attributed to anyone else?
2  A  I raised it to Jeff Culbertson. I talked about it
3  with -- I'm sure with some of guys that were on my hitch,
4  and I know I raised -- I also raised it with Jeroen Bosse.
5  Q  Who is Jeroen Bosse?
6  A  Jeroen Bosse is a directional driller.
7  Q  Does he work for Schlumberger?
8  A  Yup.
9  Q  Is he a supervisor or what he is?
10 A  He's a directional driller.
11 Q  I don't know what that means.
12 A  He's a rig hand. He operates the tools out on the
13 rig.
14 Q  But you didn't raise this issue with any outside
15 entity, any government entity or anything like that?
16 A  No.
17 Q  And then in your complaint you say, again we're
18 looking at that paragraph, you say that you thought you
19 were duty bound to do this, especially in view of the
20 written commitment, and then you have that quoted
21 language. What do you mean by the words "duty bound to do
22 this"?
23 A  Duty bound, that's what I get paid to do, is to help
24 the company out. And if something wasn't right, you're
25 supposed to come forward and let it be known.

Page 114

1  Q  And in doing that, what were the systems available to
2  you to bringing forward, as part of your job? You say
3  it's part of your job to bring this forward. What was
4  available for you to do that?
5  A  I don't know. I guess, the role that I took. I
6  could have brought it up in the RIR type form, I guess,
7  but I would have been reprimanded by, you know,
8  management.
9  Q  Were you reprimanded for any other RIRs that you
10 wrote?
11 A  I don't believe so.
12 Q  How many do you think you wrote over your employment?
13 A  Whatever the quota was.
14 Q  Okay.
15 A  It differs from year to year, from manager to
16 manager.
17 Q  So the manager set up the numbers?
18 A  Yeah.
19 Q  Do you have any recollection of how many you were
20 supposed to write in a year?
21 A  I don't remember. I think there was -- I want to say
22 right around 15 or so.
23 Q  And do you know anyone that was reprimanded for
24 writing RIRs?
25 A  Yes.

Page 115

1  Q  Who?
2  A  Joey LeBlanc.
3  Q  What do you know about that situation?
4  A  He wrote an RIR on -- I believe it was on the
5  schedule, and he ended up leaving the Slope, and then John
6  Burton actually made him go to an anger management class,
7  supposedly.
8  Q  And how do you know that he was -- that he had to
9  leave the Slope or go to that class because of the RIR?
10 A  He told everybody.
11 Q  Was something wrong with the tone of RIR? Why anger
12 management?
13 A  I guess. I don't know.
14 Q  What was the In-touch System; what is that?
15 A  The In-touch System is a system that you get on and
16 ask questions about, like, failures or best practices or
17 whatever, that -- I believe from other districts that
18 wrote in. It's kind of a -- kind of like a catalogue
19 where people can go and look for information on certain,
20 you know, certain instances that might be the same as what
21 they are dealing with.
22 Q  Did you write any type of In-touch entry for these
23 failures?
24 A  I don't think I did.
25 Q  So in your complaint, you say that you were

Page 116

1  wrongfully terminated. Why do you think you were
2  wrongfully terminated?
3  A  Well, I think I was trying to do what was meant to
4  the company, what they wanted me to do, and it was handled
5  improperly. Totally.
6  Q  So do you think that you were terminated for raising
7  these issues with Eric Larson?
8  A  I believe so.
9  Q  And just so I understand, what did you base that on?
10 A  What do I base it on?
11 Q  Yeah.
12 A  Just the circumstances that, you know, that came
13 about after my conversations with Eric Larson, and the way
14 management started treating me.
15 Q  It sounds like you were having issues with Jeff
16 Culbertson before that, back to 2004?
17 A  Well, everybody had issues with Jeff Culbertson. It
18 wasn't just myself, I mean.
19 Q  So it wasn't -- you and Jeff's relationship didn't
20 change after your May meeting with Eric?
21 A  No, not really. I mean, not until he lied to town
22 about what was going on. And then, you know, I haven't
23 spoke to him since.
24 Q  So do you think that -- were there any procedures
25 that you know of that Schlumberger had in place that you

Page 117

1  think were violated when you were terminated or when you
2  were let go, I guess, not asked back?
3  A  I don't know. I'm not sure.
4  Q  When you were brought on as an independent
5  contractor, when you talked to Joey about it, did he or
6  anyone else ever represent to you that there were only
7  certain reasons that you could be let go, that your
8  independent contractor status would be terminated?
9  A  No.
10 Q  Did you have a set time you planned to work for
11 Schlumberger? Did you have an idea you were going to be
12 there a few years, five years, 10 years?
13 A  I was hoping to be able to retire from there.
14 Q  Is that how things seem to work? Do people stay with
15 the company until retirement?
16 A  Some of them do. I mean, not as much as they used
17 to, but.
18 Q  Any idea of percentage-wise?
19 A  No idea. I have seen probably a little more than two
20 handfuls of people, if that, retire from there since I
21 have been there, off and on, for 10 years.
22 Q  So I guess here I'm just asking for your opinion. Do
23 you think that there is a -- if you were having a
24 personality conflict with your supervisor that might have
25 been appropriate grounds to terminate an employee if they

Case No. A05-0246 CI                                                                       Jason Bresser

Page 118

1  can't get along with their supervisor?
2  A    It wasn't that I couldn't get along with my
3  supervisor. He just lied to management that wouldn't get
4  both sides of the story.
5  Q    But before that, you were having issues getting
6  along? I mean, you talked about issues you were having
7  with Jeff going back to 2004.
8  A    The only issue I had with Jeff is that he wrongfully
9  -- he wrongfully -- what do you call it? He misdiagnosed
10 the failures and blamed it on technicians, which wasn't
11 the case.
12 Q    But previously you said that you didn't like other
13 things that he was doing; you didn't like -- I think you
14 said he was cracking down more, and you indicated you
15 didn't like that e-mail, but you didn't like his going
16 about --
17 A    I didn't say I didn't like it. I said if that's the
18 way he wanted to manage, then, that was up to him. I
19 mean, that is -- people have their different ways of
20 managing. If that's the way he has to do it, then that's
21 him. Other people would have probably dealt with it a
22 little bit differently.
23 Q    Were you criticizing Jeff to your coworkers, to Guy
24 Sanchez, Randy Kockritz?
25 A    Kockritz. What do you mean by criticizing?

Page 119

1  Q    Making negative comments about him.
2  A    No.
3  Q    Never said anything, complained about him to any of
4  your coworkers?
5  A    I don't think I complained about him. I said he, you
6  know, he shouldn't be in there misdiagnosing tool failures
7  and blaming it on technicians.
8  Q    Do you think you complained about anything else
9  besides the misdiagnosed tool failures about him?
10 A    I don't believe so.
11 Q    If Jeff said that you -- that he felt you were --
12 refused to take his direction, would you disagree with
13 that?
14 A    It depends on what it was. If it was, you know, if
15 he is talking about not going along with him on the tool
16 failures, then, yeah, I mean, but other than that, no,
17 anything he's ever asked me to do I did.
18 Q    How about just generally exhibiting a negative
19 attitude toward him or hostility?
20 A    No. Not at all.
21 Q    You don't think so?
22 A    Nope.
23 Q    So we kind of got halfway there, but explain to me
24 how you were finally told that you were not going back,
25 permanently not going back? I think we left it, you met

Page 120

1  with John Burton and Nate Rose?
2  A    No, no Nate Rose.
3  Q    I'm sorry. John Burton and Steve Laughlin, and you
4  were indefinitely suspended?
5  A    Yup.
6  Q    So then what happened?
7  A    Then I contacted Eric Larson, let him know what had
8  happened. I wasn't sure if he was involved in it or not.
9  I wanted an answer if I was going to back to work or not,
10 so I can make other arrangements to feed my family, and he
11 told me he would call Steve Laughlin, find out, and I
12 would have an answer that day.
13 Q    So what happened?
14 A    Nothing happened. The next day I returned his phone
15 call again -- er -- I called him and said, hey, you told
16 me I would have an answer, I still haven't had an answer,
17 and he apologized, and said that he would definitely have
18 Steve call me at home and let me know one way or another,
19 and Steve called me, and I documented the time and
20 whatever. My wife was there, and he told me that I would
21 no longer be needed for Schlumberger.
22 Q    Did he say anything else during the conversation?
23 A    He said he was sorry. That was it. About four, five
24 times.
25 Q    Have you spoken to him or John or Nate Rose since

Page 121

1  then?
2  A    No.
3  Q    How about Jeff?
4  A    Nope.
5  Q    Any of your coworkers?
6  A    I have talked to Chris. I have talked to Guy. I
7  have talked to Randy. I have talked to Corey. I have
8  talked to Erik Bishop.
9  Q    What do you talk to them about?
10 A    Just how everything is going, what's going on.
11 Q    Do you talk about your termination?
12 A    Not -- not really, because I didn't want it -- I
13 didn't want anybody else to get involved, you know, to be
14 disciplined for something that they had no control over,
15 so I just -- I don't want anybody else involved, and I
16 don't want anything to, you know, to go wrong.
17 Q    So on your complaint in section C, starts on page
18 three and goes to page four, you have a defamation claim.
19 I'm trying to pin down what is it that you think was said
20 about you that was false?
21 A    Well, for one, there is -- in one of your pieces of
22 paper there they said that Jeff Culbertson told me I
23 wasn't to spread the forks on the source box and I laughed
24 at him. That is one of them. That is a lie.
25 Q    That was in this litigation?

Page 122

1  A  Right.
2  Q  Before this lawsuit was filed, this claim has to be
3  based on something that was said about you outside of this
4  litigation. What is this claim based on? What was said
5  about you that you think was false or defamatory?
6  A  From what other people told me is that supposedly I
7  quit, didn't want to come back to work. That's what
8  management has been telling them.
9  Q  And who told you this?
10 A  Randy Kockritz.
11 Q  Who does he say told him that?
12 A  He didn't say.
13 Q  But you did admit that you made a phone call during
14 your meeting with John Burton and Steve Laughlin where you
15 accepted, at least would have sounded like to them, that
16 you accepted another job --
17 A  I told my dad, yes, I would go to work for him,
18 because Schlumberger didn't want to do business with me
19 anymore. That was after they told me it was indefinite.
20 Q  Did they know you were on the phone with your dad?
21 A  Yeah, they were right there. I don't know if they
22 knew it was my dad or not.
23 Q  They just knew you were on the phone with somebody?
24 A  Right.
25 Q  So what else was said about you that you think was

Page 123

1  false?
2  A  I don't know.
3  Q  How, I guess, how did somebody telling Randy Kockritz
4  that you quit, how does that hurt your reputation?
5  A  Well, I mean, I didn't quit, for one. If that was
6  the case, then I would still be working there, I mean, you
7  know.
8  Q  But does it change how Randy feels about you?
9  A  I don't know. You'd have to ask Randy that.
10 Q  You didn't lose anything because of it? I mean, you
11 weren't in a business relationship with Randy and now he
12 doesn't want to do business with you?
13 A  No, I wasn't in a business relationship with Randy,
14 other than work.
15 Q  Has he stopped associating with you because of this?
16 A  Kind of.
17 Q  Because of that comment or because you don't work
18 together anymore?
19 A  I don't know.
20 Q  Do you know, when did Randy tell you that that
21 comment was made?
22 A  About a month ago, a month and a half ago.
23 Q  And, again, he didn't tell you who supposedly made
24 it?
25 A  No.

Page 124

1  Q  You're sure it was somebody in management at
2  Schlumberger?
3  A  Yeah. Well, he told me, that's what town told us, so
4  town being managers in town, I would assume.
5  Q  Did Randy tell you anyone else had heard that?
6  A  No.
7  Q  And there is nothing else -- no other statements that
8  you can think of right now that you thought were untrue?
9  A  I don't think so.
10 Q  And I guess this statement that you had quit, has
11 that somehow affected your ability to find work?
12 A  I don't think that statement in particular. I don't
13 know.
14 Q  Do you know if Schlumberger has done anything that
15 would interfere with your ability to find employment, get
16 work or get another independent contractor position?
17 A  Say that again.
18 Q  Has Schlumberger or anyone with Schlumberger
19 interfered with your ability to find work or find another
20 independent contractor position?
21 A  I'm not positive on that for sure. I don't know.
22 Q  You don't know?
23 A  I don't know for sure.
24 Q  Outside of this lawsuit that was filed, have you
25 filed any other complaint with any agency, like Department

Page 125

1  of Labor?
2  A  No.
3  Q  So let's talk a little bit about what you have done
4  since you stopped being a contractor for Schlumberger. So
5  you were notified at some point in July of 2005; is that
6  correct?
7  A  Uh-huh.
8  Q  That you wouldn't be going back?
9  A  Right.
10 Q  What did you do after that to find employment or to
11 find another position?
12 A  I submitted my resume to numerous places, applied on
13 line most of the time.
14 Q  So you prepared a resume?
15 A  For sure, yeah.
16 Q  And you submitted it to a number of on line -- did
17 you like use a search like Monster, Inc., or something
18 like that, to find a position or did you just look on
19 line?
20 A  I did both. There is one -- I think it's called Oil
21 Field Registry or something like that. I posted it on
22 there, and then also different websites as far as like BP,
23 ARCO.
24 Q  You would check their websites and see what positions
25 they had?

Page 118

1  can't get along with their supervisor?
2  A  It wasn't that I couldn't get along with my
3  supervisor. He just lied to management that wouldn't get
4  both sides of the story.
5  Q  But before that, you were having issues getting
6  along? I mean, you talked about issues you were having
7  with Jeff going back to 2004.
8  A  The only issue I had with Jeff is that he wrongfully
9  -- he wrongfully -- what do you call it? He misdiagnosed
10 the failures and blamed it on technicians, which wasn't
11 the case.
12 Q  But previously you said that you didn't like other
13 things that he was doing; you didn't like -- I think you
14 said he was cracking down more, and you indicated you
15 didn't like that e-mail, but you didn't like his going
16 about --
17 A  I didn't say I didn't like it. I said if that's the
18 way he wanted to manage, then, that was up to him. I
19 mean, that is -- people have their different ways of
20 managing. If that's the way he has to do it, then that's
21 him. Other people would have probably dealt with it a
22 little bit differently.
23 Q  Were you criticizing Jeff to your coworkers, to Guy
24 Sanchez, Randy Kockritz?
25 A  Kockritz. What do you mean by criticizing?

Page 119

1  Q  Making negative comments about him.
2  A  No.
3  Q  Never said anything, complained about him to any of
4  your coworkers?
5  A  I don't think I complained about him. I said he, you
6  know, he shouldn't be in there misdiagnosing tool failures
7  and blaming it on technicians.
8  Q  Do you think you complained about anything else
9  besides the misdiagnosed tool failures about him?
10 A  I don't believe so.
11 Q  If Jeff said that you -- that he felt you were --
12 refused to take his direction, would you disagree with
13 that?
14 A  It depends on what it was. If it was, you know, if
15 he is talking about not going along with him on the tool
16 failures, then, yeah, I mean, but other than that, no,
17 anything he's ever asked me to do I did.
18 Q  How about just generally exhibiting a negative
19 attitude toward him or hostility?
20 A  No. Not at all.
21 Q  You don't think so?
22 A  Nope.
23 Q  So we kind of got halfway there, but explain to me
24 how you were finally told that you were not going back,
25 permanently not going back? I think we left it, you met

Page 120

1  with John Burton and Nate Rose?
2  A  No, no Nate Rose.
3  Q  I'm sorry. John Burton and Steve Laughlin, and you
4  were indefinitely suspended?
5  A  Yup.
6  Q  So then what happened?
7  A  Then I contacted Eric Larson, let him know what had
8  happened. I wasn't sure if he was involved in it or not.
9  I wanted an answer if I was going to back to work or not,
10 so I can make other arrangements to feed my family, and he
11 told me he would call Steve Laughlin, find out, and I
12 would have an answer that day.
13 Q  So what happened?
14 A  Nothing happened. The next day I returned his phone
15 call again -- er -- I called him and said, hey, you told
16 me I would have an answer, I still haven't had an answer,
17 and he apologized, and said that he would definitely have
18 Steve call me at home and let me know one way or another,
19 and Steve called me, and I documented the time and
20 whatever. My wife was there, and he told me that I would
21 no longer be needed for Schlumberger.
22 Q  Did he say anything else during the conversation?
23 A  He said he was sorry. That was it. About four, five
24 times.
25 Q  Have you spoken to him or John or Nate Rose since

Page 121

1  then?
2  A  No.
3  Q  How about Jeff?
4  A  Nope.
5  Q  Any of your coworkers?
6  A  I have talked to Chris. I have talked to Guy. I
7  have talked to Randy. I have talked to Corey. I have
8  talked to Erik Bishop.
9  Q  What do you talk to them about?
10 A  Just how everything is going, what's going on.
11 Q  Do you talk about your termination?
12 A  Not -- not really, because I didn't want it -- I
13 didn't want anybody else to get involved, you know, to be
14 disciplined for something that they had no control over,
15 so I just -- I don't want anybody else involved, and I
16 don't want anything to, you know, to go wrong.
17 Q  So on your complaint in section C, starts on page
18 three and goes to page four, you have a defamation claim.
19 I'm trying to pin down what is it that you think was said
20 about you that was false?
21 A  Well, for one, there is -- in one of your pieces of
22 paper there they said that Jeff Culbertson told me I
23 wasn't to spread the forks on the source box and I laughed
24 at him. That is one of them. That is a lie.
25 Q  That was in this litigation?

Page 146

1  Q  You went through that whole process?
2  A  Yup.
3  Q  Did the new loan you got when you refinanced have a
4  lower or different interest rate than the loan you had
5  before
6  A  I think it did.
7  Q  Was it lower or?
8  A  No, it was higher.
9  Q  When was your original mortgage from?
10 A  When was it from?
11 Q  Yeah, the one you were refinancing?
12 A  2003 or something, 2004. No, it was 2003, I think.
13 Q  Did you do anything to shop around for interest
14 rates? Go to different financers?
15 A  No, I didn't. I went to the same lady that did it
16 before. I think she does all that.
17    (Exhibit 11 marked.)
18 BY MS. HALL:
19 Q  Exhibit 11, I want you to look at the note at the
20 bottom and read that, because I'm hoping you can tell me
21 what this is about.
22 A  It says, "Witness to Jeff Culbertson demanding Jason
23 tell him the content of Jason's private conversation with
24 Larson. Jason refused and referred him to Larson and
25 Culbertson called him a motherfucker", and I can't read at

Page 147

1  the bottom.
2  Q  Is that you, did you write that?
3  A  No, that was Jennifer.
4  Q  Who is Jennifer?
5  A  That's his paralegal.
6  Q  So is this --
7  A  This --
8  Q  Yeah, explain it to me.
9  A  This is a stickie note that Ross Brown, one of
10 witnesses --
11 Q  Uh-huh.
12 A  -- that witnessed a bunch of this. He wanted to go
13 fishing, gave me his room number. He was staying at the
14 Millennium Hotel.
15 Q  He's the one that approached you when you were having
16 the conversation with Jeff?
17 A  Yes.
18 Q  So this was just that he's a potential witness?
19 A  He is a potential witness.
20    (Exhibit 12 marked.)
21 BY MS. HALL:
22 Q  So is this more of the notes that you took, kind of
23 your own chronology?
24 A  Yup.
25 Q  These various dates, the May 23 -- so the May 23, it

Page 148

1  looks like, just documenting that Jeff asked to talk to
2  you?
3  A  Uh-huh.
4  Q  Did he say what he wanted to talk to you about?
5  A  No. I don't believe so, no.
6  Q  Then 7/15 is this recording what you said to Eric
7  Larson or what are these notes supposed to be?
8  A  Those were just notes that I was just taking notes
9  and letting him -- Eric Larson know I wanted a time line
10 of what I did.
11 Q  So this is your time line of what you did?
12 A  Yup, I called Eric Larson and let him know what Steve
13 and John Burton had told me in the office when they
14 interrogated me.
15 Q  Did you tape record this message that you left for
16 Eric?
17 A  I don't believe so, no.
18 Q  During that conversation, did you tell him that John
19 Burton and Steve Laughlin had asked you about your
20 conversation with him? Did you say that on the message?
21 A  I don't know. I might have.
22 Q  And then, are the notes over to the left-hand side,
23 are those what he said to you?
24 A  He told me he was on vacation. He was actually at
25 the house. He wasn't at the office.

Page 149

1  Q  And then this -- the 7/16, is that second call you
2  talked about?
3  A  Yup. That's the one I called and actually got a hold
4  of him and told him what was going on. I hadn't heard
5  from Steve or whatever.
6  Q  And then after you heard from Steve, did you call
7  John Burton; is that what this note is to the left?
8  A  I don't know what that one is for sure.
9  Q  Did you around that time period call? On 7/16/05, do
10 you remember if you called John Burton?
11 A  I don't remember for sure.
12 Q  Did you tape record any of these calls?
13 A  No.
14 Q  If I can have you look at page 19 of the discovery
15 responses. They were the exhibit --
16 A  This, yeah, Exhibit 9.
17 Q  If you look on page 19, I asked you to identify each
18 person who has knowledge of the facts concerning your
19 defamation claim, and Guy Sanchez and Chris Dickman are
20 listed. I was wondering what information did they have?
21 Did they hear the statements that you're alleging?
22 A  I believe so. I think so.
23 Q  You think they overheard -- er -- they heard the I
24 quit statement or somebody said you quit?
25 A  Yeah.

## Loss During Employment

| Wages: $75,000 @ a 1.3 Alaska co-efficient = $97,500. For three years | $56,250.00 |
|---|---|
| Self-employment tax not paid by employer | $19,632.50 |
| Loss of benefits from 2002-2005 ($9/hour towards benefits) | $72,180.00 |
| | |
| TOTAL | $148,062.50 |

## Loss Since Wrongful Termination

| Lost wages from 7/8/05-8/8/05 | $5,700.00 |
|---|---|
| Loss of income in accepting lower paying job | $25,650.00 |
| Expenses due to need to re-finance brought on by pay cut | $58,866.00 |
| Attorney fees to date | |
| | |
| TOTAL | |

## Special Damages for Defamation

| To be determined | |
|---|---|
| | |

Ex. 10  Date 8-7-06
Witness Bresses
S. WARNICK  907-258-7100

0  405

Exhibit A
Page 30 of 31

```
 1                    C E R T I F I C A T E

 2         I hereby certify that I have read the foregoing

 3    transcript and accept it as true and correct, with the

 4    following exceptions:

 5    ===========================================================

 6    PAGE      LINE      CORRECTION

 7    13        1         NiNE

 8    44        25        AS AN employee

 9    45        14        SAme AS it WAS

10    47        18-19     I wasn't able to put into

11    71        20        We found the Paperwork and Jason didn't Buil too

12    78        25        It would be better if Kyle

13    79        9-10      So keep it cofident?

14    81        20        I Asked him to keep it cofidential

15    95        9         See you in the staff today?

16    95        12        have a beer with you and Sanchez

17    101       24        the

18    110       21        two Negative Names? Go fuck yourself and motherfu

19    9/13/06                    [signature]
      Date: 8/7/06         Jason Bresser
20

21         (Use additional paper to note corrections as
      needed, signing and dating each page.)            (SW)
22

23

24

25
```