IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| JASON BRESSER, )<br>)<br>      Plaintiff, )<br>)<br>  v. )<br>)<br>SCHLUMBERGER TECHNOLOGY )<br>CORPORATION, a foreign )<br>corporation organized )<br>under the laws of )<br>Texas, a/k/a )<br>SCHLUMBERGER LIMITED, )<br>)<br>      Defendant. )<br>_____) | Case No. A05-0246 CV |

**PLAINTIFF BRESSER'S OPPOSITION TO DEFENDANT SCHLUMBERGER'S MOTION FOR SUMMARY JUDGMENT ON REMAINING CLAIMS**

### I. Statement of the Case

After previous stints as a Schlumberger employee, plaintiff Jason Bresser returned to the company as an independent contractor in 2002.[1]

Schlumberger, an oil field service company, received services from Bresser in the field, on the North Slope.

On two or more occasions, Bresser's supervisor, Jeff Culbertson, told plaintiff that he could be an employee again.

---

[1] Plaintiff's affidavit at 1, para. 2.

Bresser v. Schlumberger Corporation, Case No. A-05-0246 CV
Opposition to Motion for Summary judgment
Page 1 of 15

On these occasions, Bresser responded that he needed an employment package worth $25 to $27 per hour.[2] Bresser never expected, and never asked for, a $25 to $27 wage, because he realized that employees get holiday and vacation pay, medical benefits, and participation in a Schlumberger 401(k) program -- none of which is available to an independent contractor.[3]

Schlumberger states that Bresser's contract was cancelled or not renewed for valid reasons, with each of which Bresser takes issue.

One of Schlumberger's claims is that a manager, Steve Laughlin, "discontinued the use of (Bresser's) services because Bresser refused to discuss with Laughlin the issues raised by Culbertson", Bresser's immediate supervisor.

However, the claim is untrue.[4] According to Bresser, he did not refuse to discuss issues with Mr. Burton and Mr. Laughlin. On the contrary, he asked that the conversation be expanded to include Mr. Culbertson, either in person or by telephone, "so that the truth would come out. . ."[5] Bresser even noted that a witness, whom he named, was present at the Schlumberger headquarters in Anchorage, and so available to verify that Culbertson had used foul language, subjecting Bresser to verbal

---

[2] *Id.* at 1, para. 3.
[3] *Id.* at 1-2, para. 4.
[4] Plaintiff's affidavit at 3, para. 9.
[5] *Id.*

abuse.[6]  Nevertheless, Mr. Burton and Mr. Laughlin failed to contact the witness and declined to include Mr. Culbertson in a genuine truth-finding effort[7].

Bresser spoke with Mr. John Yearwood, an executive with Schlumberger based in Houston.[8]  He asked that Mr. Yearwood keep their conversation confidential.[9]  *Id.*  Mr. Yearwood then had Eric Larson, the head of Schlumberger's Alaska operations speak with Bresser.  Larson and Bresser met on May 6, 2006.[10]

Bresser and Larson have different versions of their conversation.[11]  In his affidavit, Larson goes on to swear that he did not inform Mr. Burton, Mr. Lauglin or Mr. Culbertson about his conversation with Bresser.  So, as Bresser himself puts it:

> Thus, Schlumberger's position is that I spoke to Mr. Yearwood, who then had Mr. Larson speak with me, but that no part of my conversations with either of these men went lower than their level.[12]

Yet, on the very next working shift when Mr. Culbertson and plaintiff were together on the Slope, Culbertson swore at plaintiff.[13]

---

[6] *Id.*
[7] *Id.* at 3, para. 10.
[8] *Id.* at 3, para. 11; see defendant's Motion at 6.
[9] *Id.*
[10] *Id.* at 4, para. 12.
[11] *Cf.* plaintiff's deposition testimony at pages 81-83, 93, with   Mr. Larson's affidavit.
[12] Plaintiff's affidavit at 4, para. 12.
[13] *Id.* at 4, para. 13.

In the motor shop office which was Bresser's primary work place, Culbertson kept interrogating Bresser angrily.[14] Bresser disclosed to Culbertson that he had a confidential conversation with someone he declined to name, but who had instructed Bresser to return to work and do his job.[15] So, Culbertson, Bresser's immediate supervisor, was clearly aware that Bresser had had a confidential conversation with a manager higher in the organization than Culbertson himself was.

Culbertson "kept pressing the issue", wanting to know whom Bresser "had talked to", and what the conversation was about.[16] Culbertson became increasingly more hostile, and he appeared very angry.[17]

In the same conversation, Culbertson told Bresser that he had received an e-mail from one of his supervisors, Eric Larson, directing him to sign Bresser up for a class for potential managers.[18] As Bresser departed, Culberston swore at him.[19]

Soon thereafter -- during the next working week "hitch", Culbertson was aware that Bresser, as a loader operator acting at the request of an employee in charge of power sources, had adjusted the forks over a paperwork cannister atop a source box

---

[14] *Id.* at 4, para. 14. According to Bresser, Culbertson kept asking "What's going on? What's going on?".
[15] *Id.*
[16] *Id.* at 4-5, para. 14.
[17] *Id.* at 5, para. 14.
[18] *Id.*

Bresser v. Schlumberger Corporation, Case No. A-05-0246 CV
Opposition to Motion for Summary judgment
Page 4 of 15

that was being brought into the shop so that the forks could grab the box.

In this operation, there was no injury to the cannister or to the source box. Nevertheless, Culbertson threatened to terminate Bresser if, as a loader operator, he ever adjusted a fork over an energy source box on an energy source box again. Bresser did not argue, and simply said, "O. K." Affidavit of Bresser, page 5, paragraph 15.

When questioned by Mr. Burton and Mr. Laughlin, Bresser explained what occurred and denied that he had operated the loader in a reckless manner. Bresser also said that there was a witness who could confirm what actually occurred.[20]

At the meeting with Mr. Burton and Mr. Laughlin, Bresser was presented with a letter stating that he was suspended until further notice.[21] Bresser asked how long the suspension was likely to be, and the answer given was that the suspension could be "indefinite".[22] After that, Bresser told his father that he would be available for work because Schlumberger "didn't want to do business with me."[23]

---

[19] *Id.*

[20] Bresser's sworn statement about what he said is contradicted by Mr. Laughlin, who posits that Bresser was unwilling to discuss what Schlumberger's motion, at 10, describes as "mistreatment of equipment". For Bresser, there was no mistreatment of equipment and he was not "unwilling to discuss" the matter.

[21] Affidavit of Bresser, at 6, para. 18.

[22] *Id.*

[23] *Id.*

Another rationale offered by Schlumberger for ending its relationship with Bresser is the proposition that he failed to follow directions. Bresser, in his affidavit, responds that he has no knowledge or memory of any instance in which he failed to follow directions.[24]

## II. Argument.

**A. Bresser Has a Viable Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing, as to Which Summary Judgment Should Not Be Granted.**

   1. *The Covenant of Good Faith and Fair Dealing is Not Only Breached by a Party's "Retaliation".*

Schlumberger argues that a claim of breach of the implied covenant of good faith and fair dealing is essentially one for retaliation.

First, Schlumberger is hoist on its own petard, because while it claims -- correctly -- that Bresser was not an employee, it *argues* only from the perspective that he was one.

In fact, the very foundation for Schlumberger's motion is that Bresser was an employee.

Even in Alaska Supreme Court employment cases, which admittedly do not provide a bright line for purposes of *stare decisis*, the notion that an employer breaches the implied covenant of good faith and fair dealing only by retaliation appears to be flawed.

---

[24] *Id.* at 6, para. 19.

In *Blackburn v. State Department of Transportation & Public Facilities*, 103 P.2d 900, 907 (Alaska 2004), the Supreme Court, citing *Witt v. State*, Department of Corrections, 75 P.3d 1030, 1034 (Alaska 2003) stated in an employment case:

> The implied covenant of good faith and fair dealing has both objective and subjective components. The objective prong of the covenant is breached when an employer fails to act in a manner that a reasonable person would consider fair, which includes treating similarly situated employees disparately, terminating employees on unconstitutional grounds, and terminating employees in violation of public policy.[25]

So retaliation is just one of the ways by which the covenant can be breached by the employer. Another way is when the employer, at least in satisfaction of the "objective prong", treats the employee in a manner that a reasonable person would not consider fair.

That is the situation at bar. According to Schlumberger, it has a system in place to encourage employees and contractors to identify "RIRs", which Bresser, in testimony quoted in the

---

[25] Lest Schlumberger respond by suggesting that it is not a public employer, and so the state employment cases are inapposite, it is observed that *Witt, supra,* at 75 P.3d 1034, cited cases from the private sector, including *Era Aviation, Inc. v. Seekins*, 973 P.2d 1137, 1139 (Alaska 1999) and *Holland v. Union Oil Co. of California, Inc.*, 993 P.2d 1026, 1032. In *Holland*, the Supreme Court recalled its holding in *Luedtke v. Nabors Alaska Drilling, Inc.*, 834 P.2d 1220, 1223 (Alaska 1992)(*Luedtke II*), to wit, that whether an employer breached the covenant of good faith and fair dealing is usually a question for the trier of fact. In *Seekins*, the Supreme Court posited the question of the "subjective prong" of the implied covenant by considering whether the employer's determination of an at-will employee was unrelated to job performance. The *Seekins* court, p. 7at p. 1141, n. 29, cited *E.I.DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 444 (Del.1996), holding that while personality clashes have the potential to interfere seriously with an organization's mission, "hatred or ill will, alone, cannot be the basis for a cause of action for termination of an at-will employment."

pending motion, said could involve

> [a]nything you think will help the company save money or raise a concern or an issue, could be safety related, could be reliability issues, could be best practice.[26]

Schlumberger thus places itself in the position of asserting, on the one hand, that Bresser had a duty to report about safety and reliability and best practices, while appearing, on the other hand, to have ended its relationship with Bresser for doing just that.[27]  One of the basic ways in which the implied covenant of good faith and fair dealing can be violated, in classical contracts analysis, is when one party fails to refrain from hindering or preventing the occurrence of conditions of his own duty or the performance of the other party's duty.[28]

   2. *Even if Retaliation Were the Only Way by Which the Employer Can Breach the Implied Covenant of Good Faith and Fair Dealing, There Was Retaliation here.*

Even if retaliation were the only way to trigger a breach of the implied covenant of good faith and fair dealing, there is sufficient evidence here to show Schlumberger's retaliation against Bresser because of his contacts with Mr. Yearwood, an executive at Schlumberger's Houston office.

---

[26] **See** Defendant's Motion at 17, quoting Ex. A, Bresser Dep. at   108-109.
[27]  Bresser's view was that employees and contractors were told   to "feel free to come forward. . . To help the company", but   he declined to say that doing that "would be required."  Dep. of Bresser, page 112, lines 6-9.
[28]    **See** *Restatement Second of Contracts*, sec. 231, comment *d*.

It should not matter whether Bresser actually told Mr. Yearwood anything detrimental or derogatory to Bresser's supervisor, Jeff Culbertson, or others in the Alaska chain-of-command.[29] But it does matter that Jeff Culbertson *perceived* a danger arising from Bresser's contact with Mr. Yearwood.

According to Bresser, he disclosed to Culbertson that he had a confidential conversation with someone whose identity he declined to reveal, except to add that it was a person who had instructed Bresser to return to work and do his job.[30]

Bresser complained outside and beyond the Alaska chain of command. That Culbertson inferred that fact is strongly suggested by Culbertson's reaction: he became angry, and interrogated Bresser repeatedly.[31] He kept pressing the issue, wanting to know whom Bresser "had talked to", and what the conversation was about.[32] Culbertson became increasingly hostile.[33]

Schlumberger's bad faith is demonstrated, furthermore, by the failure of Messrs. Burton and Laughlin to accede to

---

[29] For example, in cases in which the plaintiff asserts discrimination, a retaliation claim may still lie even when the underlying discrimination claim has been dismissed. **See** *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2002) ["The district court correctly found that employee plaintiff could have reasonably believed that, in reporting an alleged rape, she was opposing an unlawful employment practice"]; *Trent v. Valley Elec. Ass'n Inc.*, 41 F.3d 524, 526 (9th Cir. 1994); *Ross v. Communications Satellite Corp.* 759 F.2d 355, 364 (4th Cir. 1985).
[30] Bresser's affidavit at 4, para. 12.
[31] *Id*. at 4, para. 14.
[32] *Id*. at 4-5, para. 14.
[33] *Id*. at 5, para. 14.

Bresser v. Schlumberger Corporation, Case No. A-05-0246 CV
Opposition to Motion for Summary judgment
Page 9 of 15

Bresser's request that there be an opportunity at which both Bresser and Culbertson might take part, either in person or telephonically. A sure-fire way to resolve a misunderstanding, assuming that there is a good faith inquiry in which the inquirers do not have a predetermined outcome, is to bring together the two individuals who are seen to be at odds. Since Schlumberger professes to be interested in "best practices", Burton's and Laughlin's rejection of Bresser's request is eloquent testimony to their attitude towards him.

3. *The "Causation" Element Is Rationally Inferable.*

Schlumberger attempts to show that the "causation" element for retaliation -- again using the employer-employee model -- is absent. Motion for Summary Judgment at 14, 20-24.

There is no doubt, taking Bresser's affidavit as true, that Culbertson was aware that Bresser had spoken to someone else in the company hierarchy. While the subject matter -- how Schlumberger might avoid waste and have a better operation in Alaska -- may not be viewed as a matter of "public concern", it was certainly a fair subject of company concern and, as noted supra, it was even a mandatory subject for Bresser to bring to light.

It is also evident that Mr. Yearwood told the head of the company's Alaska operations, Eric Larson, to follow up by contacting Bresser. According to Bresser, Eric Larson did not

contact him on May 13, 2006.[34]

While Larson claims that he did not inform Mr. Burton, Mr. Laughlin or Mr. Culbertson about his contact with Bresser, he does not claim that he was ignorant of Bresser's contact with Yearwood. The corporation asks the court to decide, with no trial, and at a stage when Bresser's sworn averments are to be seen as credible, that although Yearwood told Larson to contact Bresser, and although Larson did that, and although Culbertson was angry at Bresser right after Bresser spoke to Yearwood, Burton and Laughlin were unaware of the Bresser-Yearwood conversation.[35] All they knew was that there was a problem between Culbertson and Bresser, which prompted Burton and Laughlin to call Bresser in.[36] Schlumberger wants the court to not only consider, but to actually conclude with a trial, that Burton and Laughlin were aware that Culbertson was angry at Bresser, and had "concerns", but deny they were aware that Culbertson knew that Bresser had gone up the chain of command with information or suggestions.

The "third prong" suggested by Schlumberger is a causal link between the plaintiff's activity and the termination of his

---

[34] Affidavit of Bresser, pages 3-4, paragraph 10-11.
[35] According to Bresser, Mr. Larson likely heard part of the conversation beween Bresser and Yearwood. Exh. A, p. 17, dep. page 78.
[36] Schlumberger, citing Exhibit C (Defendant's Responses to plaintiff's First Discovery Requests at 14, asserts at page 8 of the ending motion that Mr. Laughlin "wanted to have this meeting with Bresser to address concerns. . . that Culbertson was raising."

contract. The fatal meeting involving Bresser, Burton and Laughlin occurred on July 14, 2005.[37]

Bresser has stated that he spoke with Mr. Yearwood on two occasions, including May 5, 2005.[38] On the next day, Friday, May 6, 2005, Eric Larson called him to set up an appointment.[39] they met on May 13, 2005.[40]

It was about two weeks later, probably at the end of May, and about six weeks prior to the July 14 meeting with Mr. Burton and Mr. Laughlin when Culbertson swore at Bresser and pressed him about his contacts with a manager or managers at a higher company level.[41]

In *Clark County School District v. Breeden*, 532 U.S. 268 (2001), the Supreme Court reversed a decision by the Ninth Circuit and upheld summary judgment for the employer whose adverse employment action took place 20 months after the employee had filed a charge of discrimination.

In a later case, *Booker v. Federal Reserve Bank of New York*, 2003 WL 1213148 (S.D.N.Y. March 17, 2003), the district court articulated the position that a four-month proximity provides some evidence of a causal connection (although it does not show causal connection standing alone). In *Smith v. Meyer*

---

[37] Motion for Summary Judgment at 9.
[38] Exh. A, p. 20, dep. of Bresser, pp. 90-91.
[39] *Id.*, p. 20, dep. of Bresser, p. 93.
[40] Affidavit of Bresser, page 4, para. 11.

*Builders*, 2006 WL 543706 (W.D.N.Y. March 3, 2006), the court held that six weeks is close enough. That is about the same time period between Culbertson's angry inquiries about Bresser's contacts up the corporate ladder and the end of Bresser's contract.

For the purposes of the motion for summary judgment, the causal "prong" is satisfied.

Schlumberger, in short, is in the awkward position of claiming that its contractor, Bresser, had a duty to report ways by which the company could be more efficient and profitable, while at the same time, giving Bresser the favorable inferences to which he is entitled at this stage, having penalized Bresser for performing that duty. Culbertson, Bresser's immediate supervisor was angry because Bresser went up the management chain, essentially pointing out misdiagnoses and inefficiencies which Culbertson inferrably took to be a reflection upon him. Culbertson's fury at Bresser is also made manifest by his report of an incident, described in Bresser's affidavit at page 5, paragraph 15, which involved no injury to any property or equipment, and which occurred during the next "hitch" following Culbertson's utterances of profanity towards Bresser. Affidavit of Bresser, pages 4-5, paragraph 14.

For the foregoing reasons, the motion for summary judgment

---

[41] *Id.*, page 4, para. 13

as to whether defendant breached the implied covenant of good faith and fair dealing should be DENIED.

**B. The Defamation Claim, the Claim to a Legally Enforceable Contract for Future Employment, and the Plaintiff's Public Policy Claim.**

1. *Defamation*.

Bresser has been damaged because of falsehoods told about him by Culbertson. These falsehoods include the claim that Bresser was reckless with equipment, failed to follow his directions, acted rudely and inappropriately towards him. In addition, defendant, through its agents, have said that Bresser "quit".

However, Culbertson's statements, as well as the statement by him or others that Bresser "quit", made to others within the defendant corporation's hierarchy, appear to have been legally privileged and so not actionable. *Crowe v. Wiltel Communication Systems*, 103 F.3d 897, 899 (9th Cir. 1996).

2. *Contract for Future Employment; Public Policy Tort*.

Schlumberger's contention that Bresser has not identified a public policy in the common law, statutes or Constitution of Alaska which makes defendant liable to Bresser in tort, in addition to its liability for breach of the implied covenant of good faith and fair dealing, is justified. Bresser's affdaivit, pages 1-2, paragraph 3, indicate that no meeting of the minds settling the terms applicable to the

resumption of employment in lieu of independent contractor status, was arrived at.

For the foregoing reasons, an order granting Schlumberger partial summary judgment (only as to the defamation claim (notwithstanding untruths uttered about Bresser), public policy tort, and the enforceability of promised employment, would not be inappropriate. However, as noted *supra* at pages 6 to 13, the case should be set for trial as to Bresser's claim for breach of the implied covenant of good faith and fair dealing.

DATED January 9, 2007.

/s/ Joe P. Josephson
Josephson and Associates
912 W 6th Ave
Anchorage AK 99501
Phone: (907) 276-0151
Fax: (907) 276-0155
Email: jjosephson@aol.com
Attorney for Jason Bresser
Alaska Bar No. 6102018

Certificate of Service:

I hereby certify that on 1/9/07,
a copy of the foregoing Opposition to
Motion for Summary Judgment was
Served electronically on Tom Daniel

/s/ Joe P. Josephon