## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

JASON BRESSER

                Plaintiff,

vs.

SCHLUMBERGER TECHNOLOGY
CORP., a foreign corporation organized
under the laws of Texas, a/k/a
SCHLUMBERGER LTD.,

                Defendant.

Case No. 3:05-cv-00246-TMB

**ORDER  REGARDING
MOTION TO DISMISS CLAIMS FOR
EMPLOYEE BENEFITS AND
MOTION FOR SUMMARY
JUDGMENT ON REMAINING
CLAIMS**

### I.  MOTIONS PRESENTED

Plaintiff Jason Bresser ("Bresser") has sued Defendant Schlumberger Technology Corp. ("Schlumberger") for breach of the covenant of good faith and fair dealing, defamation, breach of contract as to wages and benefits, and unspecified violations of law and public policy. Defendant moves to dismiss Plaintiff's third and fourth claims for failure to state a claim upon which relief may be granted, or in the alternative, for summary judgment. Defendant separately moves for summary judgment on the remaining claims.

For the reasons set forth below, the Court GRANTS the Defendant's motion to dismiss the breach of contract and violation of public policy claims in Plaintiff's first amended

complaint, and GRANTS the Defendant's motion for summary judgment on the two remaining

claims.

## II. BACKGROUND

After working for Schlumberger as an employee from 1996 to 1999 and from

2000 to 2001, Bresser resumed working for the company as an independent contractor in

December 2001. As an employee, Bresser worked on drilling equipment and in motor shop

operations; as an independent contractor he worked in the company's Prudhoe Bay shop. He did

not participate in the employee's retirement plans or receive health benefits as an independent

contractor. On July 8, 2005, Schlumberger suspended Bresser indefinitely and a supervisor later

informed him that the company would no longer need his services.

Bresser sued Schlumberger in Alaska Superior Court in October 2005, and

Schlumberger removed the case to federal district court. Bresser's complaint alleges that he was

fired in retaliation for "having brought problems of tool design and maintenance, and corporate

waste, to the attention of defendant's managers." According to Bresser, his immediate

supervisors were angered that he circumvented the company's chain-of-command and spoke with

Schlumberger executives John Yearwood and Eric Larson about alleged problems in diagnosing

equipment malfunctions. Bresser spoke with Yearwood on two occasions, and met with Larson

over lunch on May 13, 2005. His dismissal occurred roughly two months later. In the interim,

Bresser alleges, an immediate supervisor, Jeff Culbertson, swore at him and pressed him for

details about his contacts with higher-ranked Schlumberger managers.

## III. DEFENDANT'S MOTION TO DISMISS

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency

of a claim. In ruling on a motion to dismiss, the court must accept as true all allegations of

material fact and must construe said allegations in the light most favorable to the non-moving party.[1]

A complaint may be dismissed as a matter of law for two reasons: "(1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal claim."[2] To grant a motion to dismiss, it must appear to a certainty that a plaintiff would not be entitled to relief under any set of facts which could be proved consistent with the allegations.[3]

Under Local Rule 7.1(d)(1), the Court may accept as well taken and summarily rule on a motion to which the non-moving party has not responded, as long as the motion does not seek summary judgment. Bresser has not filed a response to Schlumberger's motion to dismiss at Docket No. 21. The Court thus considers Bresser's lack of response to be an admission the motion is well taken. In any event, the Court has reviewed the motion to dismiss and found it to be facially valid.

Schlumberger moves to dismiss Bresser's breach of contract and public policy claims on the ground that they are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"),[4] which requires that claims subject to the Act be pursued under its civil enforcement provision, section 502(a). Although ERISA does not explicitly mention the

---

[1]    *Stoner v. Santa Clara Co. Office of Educ.*, 502 F.3d 1116, 1120 (9th Cir. 2007).

[2]    *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984) (citing 2A J. Moore, Moore's Federal Practice ¶ 12.08 at 2271 (2d ed. 1982).

[3]    *Davel Comm., Inc., v. Qwest Corp.*, 460 F.3d 1075, 1088 (9th Cir. 2006).

[4]    29 U.S.C. §§ 1001 *et seq*. ERISA subjects to federal regulation plans providing employees with certain fringe benefits. It imposes on the plans requirements regarding participation, funding and vesting, and sets uniform standards for reporting, disclosure and fiduciary responsibility. *Burgio and Campofelice, Inc. v. New York State Dept. of Labor*, 107 F.3d 1000, 1007 (2nd cir. 1997).

exhaustion doctrine, courts have applied it after examining the text and legislative history of the act.[5] Because it is undisputed that Bresser has not exhausted his administrative remedies under ERISA, Schlumberger argues that the claims alleging denial of employee benefits should be dismissed.

By its terms, ERISA supersedes "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan" subject to ERISA.[6] The term "State laws" is defined to include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State."[7] Similarly, it is well-settled law that the civil enforcement remedies Congress included in ERISA were intended to be exclusive.  "[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted."[8] More specifically, one of the areas in which Congress intended ERISA to preempt state law claims centers on "state laws providing alternate enforcement mechanisms for employees to obtain ERISA plan benefits."[9]

Courts have recognized that a state law "relates to" an employee benefit plan "if it

---

[5] *Amato v. Bernard*, 618 F.2d 559, 566-68 (9th Cir. 1980); *see also* 29 U.S.C. § 1133 (requiring ERISA-governed plans to provide a "full and fair review" of a denial of a claim for benefits).

[6] 29 U.S.C. § 1144(a).

[7] 29 U.S.C. § 1144(c)(1).

[8] *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004).

[9] *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1468 (4th Cir. 1996) (citing *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 ( (1995).

has a connection with or reference to such a plan."[10] Similarly, courts have treated claims

asserting eligibility for benefits – where eligibility hinges on the plaintiff's status as an employee

versus an independent contractor – as relating to the benefit plan in question, and thus subject to

ERISA preemption.[11]

Here, Bresser's third and fourth claims assert that Schlumberger breached its

contract with him and violated public policy by improperly classifying him as a "contractor" and

thus denying him benefits properly owed to him as an "employee." In his third claim, Bresser

alleges that:

> The defendant owes plaintiff the difference between the wages and
> benefits promised to plaintiff . . . and the wages (lacking benefits,
> such as social security contributions, Medicare, and the employer's
> portion of the federal income tax liability related to plaintiff),
> actually paid between the date of his return at the end of 2001 and
> the date of his wrongful termination.

Bresser's fourth claim alleges that: "[i]n treating plaintiff, for payroll purposes, as a 'contractor'

and not as an 'employee,' defendant acted contrary to federal and state statutes and regulations,

governing wages, hours, taxes and benefits, and defendant breached public policy." Because

Bresser's third and fourth claims "relate to" ERISA-governed employee benefit plans [by

asserting eligibility for the plans,] the Court finds merit in Schlumberger's argument that

Bresser's state law claims are preempted by ERISA.[12] The Court reaches this conclusion without

---

[10]    *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983).

[11]    *See, e.g., Bauer v. Summit Bancorp*, 325 F.3d 155 (3rd Cir. 2003); *Hensley v. Northwest Permanente P.C. Ret. Plan & Trust*, 258 F.3d 986 (9th Cir. 2001), *overruled on other grounds, Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 966 (9th Cir. 2006).

[12]    The Court also notes that Bresser appears to concede his third and fourth claims in response to Schlumberger's motion at Docket No. 28 for summary judgment on the remaining claims. As to the fourth claim, Bresser's response states that: "Schlumberger's contention that Bresser has not identified a public policy in the common law, statutes or Constitution of Alaska

looking beyond the pleadings in this case, thus there is no need to convert Schlumberger's motion to dismiss into a motion for summary judgment. The Court therefore grants Schlumberger's motion to dismiss claims three and four in Bresser's first amended complaint.

## IV. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE REMAINING CLAIMS

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[13] The moving party bears the initial burden of proof for showing that no fact is in dispute.[14]   If the moving party meets that burden, then it falls upon the non-moving party to refute with facts which would indicate a genuine issue of fact for trial.[15] A *scintilla* of evidence, or evidence that is merely colorable or not significantly probative, is not sufficient to present a genuine issue as to a material fact.[16]

## A. PLAINTIFF'S COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM

---

which makes defendant liable to Bresser in tort . . . is justified." As to the breach of contract claim, Bresser acknowledges that "no meeting of the minds settling the terms applicable to the resumption of employment in lieu of independent contractor status [] was arrived at." He concludes that: "an order granting Schlumberger partial summary judgment . . . as to the . . . public policy tort, and the enforceability of promised employment, would not be inappropriate."

[13]     Fed. R. Civ. P. 56( c).

[14]     *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[15]     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[16]     *Hambleton Bros. Lumber Co. v. Balkin Enterprises, Inc.* 397 F.3d 1217, 1226 (9th Cir. 2005) (quotations omitted).

Schlumberger argues that summary judgment is appropriate on Bresser's implied covenant claim because Bresser has not stated a legally viable claim or shown that his termination actually violated the covenant. Bresser responds that his breach-of-covenant claim is viable under two legal theories. The first is that his Alaska supervisors fired him in retaliation for his conversations with Schlumberger executives about ways in which the company could improve efficiency and profitability. Bresser's second legal theory is that Schlumberger treated him in a way that a reasonable person would consider unfair, thus violating the covenant's objective element.

Under Alaska law, an implied covenant of good faith and fair dealing is part of every contractual relationship, including an employment relationship.[17] The implied covenant can be breached objectively or subjectively.[18] The objective prong is breached when an employer "fails to act in a manner that a reasonable person would consider fair . . . "[19] or that violates public policy.[20] The subjective prong focuses on the employer's motive, requiring proof that the decision to fire or take adverse action against the employee was actually made in bad faith.[21]

Alaska courts have held that retaliatory firings can create a claim for breach of the

---

[17]    *Mitford v. de LaSala*, 666 P.2d 1000, 1007 (Alaska 1983).

[18]    *Witt v. State, Dep't of Corrections*, 75 P.3d 1030, 1034 (Alaska 2003).

[19]    *Id*.

[20]    *Luedtke v. Nabors Alaska Drilling,* Inc., 768 P.2d 1123, 1130  (*Luedtke I*) (citing *Knight v. Am. Guard & Alert, Inc.*, 714 P.3d 788, 792 (Alaska 1986)).

[21]    *Era Aviation, Inc. v. Seekins*, 973 P.2d 1137, 1141 (Alaska 1999) ("To be subjectively unfair, the employer's conduct must actually be motivated by an improper or impermissible objective . . . ").

implied covenant of good faith and fair dealing.[22] To define the elements of a retaliatory discharge claim, the Alaska Supreme Court has adopted the three-part test used in federal Title VII employment discrimination cases.[23] A plaintiff bringing such a claim must establish a prima facie case by showing that: (1) the employee was engaged in a protected activity; (2) the employer subjected the employee to an adverse employment action; and (3) there was a causal connection between the protected activity and the employer's action.[24] Once a plaintiff establishes these elements, the employer may rebut the inference of retaliation by presenting a non-retaliatory explanation for the adverse employment action.[25] If the employer successfully rebuts the prima facie case, the burden of proof then shifts back to the employee to show that the employer's explanation was a pretext and the true motive was retaliation.[26]

In a summary judgment context, an employer claiming that the plaintiff has failed to establish a prima facie case of retaliation "must offer evidence showing that the employee had not engaged in protected activity, or that the activity was not a motivating factor in her termination, or that [he] would have been terminated for other reasons."[27] Along with this, the employer must show that "there is no real dispute as to any of the critical issues."[28] If this burden

---

[22]     *Lincoln v. Interior Reg. Hous. Auth.*, 30 P.3d 582, 586 (Alaska 2001).

[23]     *Id.*

[24]     *Id.*; *Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 433 (Alaska 2004).

[25]     *Lincoln*, 30 P.3d at 586.

[26]     *Id.* at 586-87.

[27]     *Id.* at 587.

[28]     *Id.*

is met, and the employee fails to present evidence showing that a critical issue of fact is reasonably disputed, then the employer is entitled to summary judgment.[29]

Here, Schlumberger argues that Bresser has failed to satisfy the first and third elements of the three-part test because he has not shown that any of his actions qualify as a "protected activity" or that the company's dismissal of him was based on any alleged protected activity. Bresser asserts that he has established a prima facie case of retaliation by showing that: (1) he spoke with two Schlumberger executives about problems related to tool design, maintenance and corporate waste; (2) he was indefinitely suspended and told that Schlumberger would no longer need his services; and (3) a causal link between his conversations with the executives and his suspension can be inferred based on the temporal proximity between the two. While Bresser does not explicitly identify the precise "protected activity" in which he engaged, his complaint, deposition and answers to interrogatories assert that he was fired in retaliation for speaking with Schlumberger executives John Yearwood and Eric Larson about equipment failures that were misdiagnosed by maintenance personnel on the North Slope, forcing Schlumberger to assume the costs of the equipment failures.[30] The Court must therefore examine whether Bresser's contact with the Schlumberger executives constitutes a "protected activity" in connection with the first element of the retaliatory discharge test. According to Bresser, his contact with the two executives consisted of: a 15-20 minute conversation with Yearwood, who is based in Houston,

---

[29]    *Id.*

[30]    At his deposition, Bresser explained his concern that Schlumberger clients were operating tools "outside of [their] parameters" and "therefore, the shop or Schlumberger was assuming the cost of the failure, which wasn't right." He added that the clients "should have acquired the cost of the failure. . . . but since it was wrongfully misdiagnosed, we assumed the cost of the failure."

during his visit to the company's North Slope operations; a follow-up phone conversation with Yearwood; and a lunch in Anchorage with Larson, the head of Schlumberger's Alaska operations. During his face-to-face conversation with Yearwood, Bresser mentioned one or two incidents in which equipment failures were misdiagnosed. In the follow-up phone call, Bresser told Yearwood that he wanted to "put on a Powerpoint presentation" about maintenance operations on the North Slope, but that he would "like to keep it kinda confidential" because "[m]y manager doesn't know what's going on." Bresser added that his presentation would "open your . . . eyes to where Schlumberger can save a considerable amount of money, not just in one location . . . . [b]ut all over the world." Shortly thereafter, Bresser received a phone call from Larson, who said that Yearwood asked him to meet with Bresser. After telling Larson that he did not feel comfortable going to the company's Anchorage office, the two agreed to meet over lunch at a restaurant in Anchorage. During lunch, Bresser disclosed the three misdiagnosed equipment failures and "why they shouldn't have been – why Schlumberger shouldn't have assumed the cost of the failures and why we ended up doing that." According to Bresser, Larson informed him at the conclusion of the lunch that the meeting was not confidential, and that Larson had contacted one of Bresser's supervisors for information related to the concerns raised by Bresser.[31]

　　　　　Bresser's complaint states that, in approaching Yearwood and Larson, he "did what he reasonably thought he was duty-bound to do . . . "[32] Asked at his deposition to explain what he

---

[31]　　In an affidavit filed by Schlumberger, Larson disputes much of Bresser's account of their discussion. For the purpose of the summary judgment motion, the Court assumes the facts and allegations set forth by Bresser are true, and draws all inferences in his favor.

[32]　　Bresser's complaint states that his sense of duty was underscored by "a written commitment set out in a publication published and circulated by defendant [which states: ']giving all our people absolute authority to stop any activity that may possibly threaten service

meant by "duty-bound," Bresser responded: "Duty bound, that's what I get paid to do . . . to help the company out. And if something wasn't right, you're supposed to come forward and let it be known." When asked if he thought he was required to report his concerns by law, Bresser stated: "I don't know if it would be required, but in their handbook it says . . . feel free to come forward if you're going to . . .  help the company in any way, shape, or form, pretty much."

While the question of whether Bresser's actions constitute a "protected activity" is central to his breach-of-covenant claim, neither party cites legal authority describing or defining the phrase "protected activity." Instead, Schlumberger equates "protected conduct" to conduct "protected by a public policy" and contrasts Bresser's claim to Alaska cases recognizing retaliatory discharge claims for employees reporting unsafe working conditions or safety violations, filing for workers' compensation benefits, and testifying against an employer.[33] Schlumberger concludes that Bresser's "type of suggestion or improvement is just not the type of legally protected activity that could form the basis for a public policy wrongful termination claim. Bresser does not directly respond to Schlumberger's "protected activity" argument; nor does he cite any legal authority on this point. Rather, Bresser argues that: "While the subject matter – how Schlumberger might avoid waste and have a better operation in Alaska – may not be viewed as a matter of 'public concern,' it was certainly a fair subject of company concern and . . . it was even a mandatory subject for Bresser to bring to light."

---

or produce quality, health, safety, or the environment.['] and, further ['encouraging a culture of openness and continuous improvement.[']"

[33]    *See Kinzel*, 93 P.3d at 433; *Reed v. Municipality of Anchorage*, 782 P.2d 1155, 1158-59 (Alaska 1989); *Norcon, Inc. v. Kotowski,* 971 P.2d 158, 167 (Alaska 1999); and *Reust v. Alaska Petroleum Contractors, Inc*., 127 P.3d 807, 812 (Alaska 2005).

The Court concludes that Bresser's actions, when viewed in the light most favorable to him, do not rise to the level of a "protected activity" and, therefore, Bresser has failed to establish a prima facie case of retaliation. In the absence of clear legal authority defining "protected activity," the court looks for guidance to cases in which Alaska courts have found that particular conduct amounted to a "protected activity." As Schlumberger notes, such cases have generally involved actions protected by statute or by public policy. For example, the Alaska Supreme Court has held that firing an employee in retaliation for filing a job safety and health complaint gives rise to a cause of action for breach of the implied covenant.[34] The Alaska court has also recognized an employee's cooperation with federal officials during an investigation of a regional housing authority as a "protected activity."[35] Similarly, the court has held that Alaska has a public policy of protecting witnesses and that retaliation against witnesses is an actionable claim for violation of public policy.[36]

In looking to public policy to define a "protected activity," the Alaska court has relied on "the common law, statutes, and the constitution of this state," while acknowledging that there are no precise rules defining the existence of a public policy.[37] Quoting an Illinois Supreme Court case, the Alaska court noted that a "matter must strike at the heart of a citizen's social

---

[34]    *Reed*, 782 P.2d at 1158-59; *see also Kinzel*, 93 P.3d at 438 (holding that Alaska has explicit public policies that protect employees who make workers' compensation claims and act as whistleblowers).

[35]    *Lincoln*, 30 P.3d at 587.

[36]    *Reust*, 127 P.3d at 813.

[37]    *Luedtke I*, 768 P.2d at 1132.

rights, duties, and responsibilities" before it rises to the level of a violation of public policy.[38]

Bresser has not asserted that his conduct is protected by statute, common law, or the Alaska constitution. Nor has he asserted that Schlumberger's indefinite suspension of him violated a particular public policy. In particular, he has not alleged that his reporting of the errant equipment diagnoses raised safety concerns. Rather, he suggests only that the mistakes cost the company money and that, in his view, those costs should have been absorbed by Schlumberger's clients. Given this, the Court finds that the conduct alleged by Bresser is qualitatively different from the actionable claims previously recognized by Alaska courts. Bresser's allegations may raise questions of corporate management but do not "strike at the heart of a citizen's social rights, duties and responsibilities." Bresser has thus failed to establish the first element of a prima facie case for retaliation. Because of this, the Court need not consider Schlumberger's argument that Bresser did not engage in a "protected activity" because in raising his concerns with Yearwood and Larson Bresser was simply doing his job. The Court also need not consider the issue of whether Bresser has established the third element of a retaliatory discharge claim; that is, whether he has shown a causal link between his conduct and Schlumberger's dismissal of him.

The Court next considers Bresser's theory that Schlumberger breached the implied covenant's objective prong by treating him in a manner that a reasonable person would consider unfair. He alleges that the company has placed "itself in the position of asserting, on the one hand, that Bresser had a duty to report about safety and reliability and best practices, while appearing on the other hand, to have ended its relationship with Bresser for doing just that." Bresser adds that: "One of the basic ways in which the implied covenant of good faith and fair

---

[38]     *Id.* (quoting *Palmateer v. Int'l Harvester*, 421 N.E.2d 876 (1981)).

13

dealing can be violated, in classical contracts analysis, is when one party fails to refrain from hindering or preventing the occurrence of conditions of his own duty or the performance of the other party's duty."

As noted above, the objective prong of the implied covenant can be breached when an employer acts in a manner which a reasonable person would regard as unfair." The Alaska Supreme Court has cited as examples of objective breaches cases involving disparate employee treatment, terminations on grounds found to be unconstitutional, and firings that violated public policy.[39] The Alaska court has not described this as an exclusive list, but it has cautioned against interpreting the covenant too broadly. The covenant "is implied in every contract in order to effectuate the reasonable expectations of the parties to the agreement, not to alter those expectations."[40] Hence, the "covenant of good faith cannot be interpreted to prohibit what is expressly permitted . . . "[41]

Notably, Bresser does not contend that he was a for-cause employee.[42] Rather, he seems to suggest that Schlumberger led him to form a reasonable belief that he was expected or even required to report his concerns related to equipment misdiagnoses and related costs. And

---

[39]    *Era Aviation*, 973 P.2d at 1140 (citing *Luedtke II*, 834 P.2d at 1224).

[40]    *Ramsey v. City of Sand Point*, 936 P.2d 126, 133 (Alaska 1997).

[41]    *Id*.; *see also Casey v. Semco Energy, Inc.*, 92 P.3d 379, 385 (Alaska 2004) (Absent a showing of breach, the implied covenant "does not provide courts with carte blanche to rewrite contracts . . . ").

[42]    As his deposition, Bresser was asked: "When you were brought on as an independent contractor, when you talked to Joey about it, did he or anyone else ever represent to you that there were only certain reasons that you could be let go, that your independent contractor status would be terminated?" He answered: "No."

14

while Schlumberger has stated that his dismissal was based on job performance, attitude, and Bresser's ability to get along with his supervisors, Bresser alleges that the true reason was his decision to circumvent the company's chain of command and report perceived problems on the North Slope to higher-ranked corporate executives.

Assuming *arguendo* that Bresser's allegations are true, they are legally insufficient to justify a finding that Schlumberger violated the objective element of the implied covenant. Bresser has not alleged disparate treatment or that his dismissal was based on an unconstitutional ground. Nor has he suggested that it violated a public policy. Given the at-will nature of Bresser's employment with Schlumberger, the Court cannot declare that Schlumberger's desire to curtail Bresser's contact with corporate executives was an impermissible motive. Our conclusion is bolstered by the Alaska Supreme Court's decision in *Era Aviation v. Seekins*, in which the court held that termination of an at-will employee, even if based on a personality conflict, rather than poor job performance, did not violate the covenant of good faith and fair dealing because firing an employee based on a personality conflict was not an improper or impermissible basis for termination.[43] While dismissing an at-will employee or independent contractor for reporting problems in diagnosing equipment failures may make little sense from a management perspective, it does not, under the circumstances of the instant case, violate the implied covenant.

The Court thus grants Schlumberger summary judgment on Bresser's breach-of-covenant claim.

### B. PLAINTIFF'S DEFAMATION CLAIM

---

[43]        *Era Aviation,* 973 P.2d at 1141.

Bresser's complaint alleges that Schlumberger, its agents, officers and employees falsely asserted that Bresser's peers had difficulty working with him, and that these assertions were made maliciously and in bad faith. Bresser further alleges that this statement was intentionally calculated to harm his reputation, career, and income. In his response to Schlumberger's summary judgment motion, Bresser asserts alternate bases for his defamation claim. Yet he also concedes that the claim is "not actionable." Specifically, Bresser's response brief states that the allegedly defamatory statements "appear to have been legally privileged and so not actionable." It further states: "[a]n order granting Schlumberger partial summary judgment (only as to the defamation claim (not withstanding untruths uttered about Bresser) . . . would not be inappropriate." Finally, the brief concludes that "the case should be set for trial as to Bresser's claim for breach of the implied covenant of good faith and fair dealing." The Court interprets these statements, taken together, as a concession of Bresser's defamation claim. Accordingly, the Court grants summary judgment to Schlumberger.

## V. CONCLUSION

For the reasons stated above, the Court GRANTS Defendant's motion to dismiss at Docket No. 21, and GRANTS Defendant's motion for summary judgment on the remaining claims at Docket No. 28.

Dated this 13th day of December, 2007.

/s/ Timothy Burgess
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE

16